Karen SAVINO, Plaintiff,

v.

THE C.P. HALL COMPANY, Defendant.

No. 96 C 3582.

United States District Court,
N.D. Illinois,
Eastern Division.

Dec. 31, 1997.

Ernest Thomas Rossiello, Melinda Higgins Brom, Elena M. Dimopoulos, Annice M. Kelly, Ernest T. Rossiello & Associates, P.C., Chicago, IL, for Plaintiff.

Frederic H. Fischer, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, Patricia J. Hill, Rogers, Towers, Bailey, Jones & Gay, P.A., Jacksonville, FL, for Defendant.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

Plaintiff Karen Savino brought this action against the defendant, the C.P. Hall Company, under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. Savino alleges that she was sexually harassed by her supervisor, William Popper, in violation of Title VII's prohibition against discrimination on the basis of sex. 42 U.S.C. § 2000e–2(a)(1). Specifically, Savino claims that Popper conditioned job benefits upon her submission to his sexual requests and created a hostile work environment based upon her gender. Savino further alleges that after she complained about the harassment, the defendant retaliated against her by withholding two accounting positions from her and denying her a raise in violation of 42 U.S.C. § 2000e–3(a)(1).

Currently before the Court is C.P. Hall's motion for summary judgment on all counts of the complaint. C.P. Hall argues that Savino has presented insufficient evidence to support her sexual harassment claims. In addition, C.P. Hall asserts that it had valid,

nonpretextual reasons for not promoting Savino to the accounting positions and not offering her a raise. After careful review, we deny defendant's motion in part and grant the motion in part.

## RELEVANT FACTS

We begin by presenting the facts in a light most favorable to the plaintiff.[1] In response to a newspaper advertisement, Savino applied for a part-time position with C.P. Hall. Pl.'s Add'l Facts ¶ 3. William Popper ("Popper"), Plant Engineer for C.P. Hall's maintenance department, interviewed Savino and ultimately hired her as his part-time maintenance clerk. Def.'s Facts ¶¶ 4, 22; Pl.'s Add'l Facts ¶¶ 3, 5. While Popper made the decision to hire Savino, Cynthia Green, C.P. Hall's Human Resources Supervisor, actually offered Savino the position. Def.'s Facts ¶¶ 7, 21, 25; Pl.'s Facts ¶ 21; Pl.'s Add'l Facts ¶ 5.[2]

On April 1, 1995, Savino began working at C.P. Hall's "5851 facility" in Bedford Park.[3] Pl.'s Facts ¶ 36; Def.'s Facts ¶ 23. Savino's duties included some computer work, writing up and closing work orders, clerical work, and some bookkeeping duties, such as maintaining expense reports, checking invoices, and reconciling monthly expenses. Pl.'s Facts ¶¶ 31–33. Savino shared an office with Popper, and their desks were "very close." Pl.'s Add'l Facts ¶ 8; Def.'s Facts ¶ 39. As a part-time employee, Savino worked approximately 20 hours per week (Pl.'s Facts ¶ 30)

and did not receive any benefits. Def.'s Facts ¶ 38.

### The Alleged Harassment

Shortly after Savino started working at C.P. Hall, she noticed that her supervisor's behavior was somewhat odd. She often caught Popper staring at her. Instead of turning away in embarrassment, Popper would simply smile at her. Popper then began following Savino around the office, timing her breaks so that he could visit with her. Pl.'s Add'l Facts ¶¶ 9–11. In an apparent attempt to isolate Savino, Popper discouraged her from interacting with others in the department, warning Savino that they were not to be trusted. Pl.'s Add'l Facts ¶ 10. While not overtly objectionable, Popper's behavior made Savino feel uncomfortable.

Things soon began to escalate, however, and Savino alleges that Popper's behavior progressed from inappropriate to blatantly offensive and physical. For example, Savino claims that Popper: 1) attempted to put packets of coffee down her shirt, *id.* ¶ 15; 2) showed Savino a soap dispenser, referred to it as a "dick," and asked her if she wanted to "insert it into the washroom," *id.* ¶ 16; 3) made remarks about "oral sex" and touched her legs while changing the computer paper near Savino's desk, *id.* ¶ 17; 4) told Savino that she had a "nice ass," Pl.'s Add'l Facts ¶ 18; 5) responded to a radio program that asked "is there a Mount Nip or Nipple in the

---

1. *See* Northern District of Illinois Local General Rule 12(M)–(N). Rule 12(M)(3) requires a party moving for summary judgment to file "a statement of material facts as to which the moving party contends there is no genuine issue." The movant's statement must contain "specific references to affidavits, parts of the record, and other supporting material relied upon to support the facts set forth." Rule 12(M)(3). Defendant's statement is cited as "Def.'s Facts ¶ ___." Similarly, Rule 12(N)(3)(a) requires the non-moving party to file a concise response to the movant's statement including, in the case of any disagreement, specific references to supporting materials. Savino's response is cited as "Pl.'s Facts ¶ ___." Rule 12(N)(3)(b) authorizes the non-moving party to submit a statement of "additional facts that require the denial of summary judgment"; under Rule 12(M), the moving party may then submit a reply to the non-moving party's additional facts. Savino's statement of additional facts is cited as "Pl.'s Add'l Facts ¶ ___.", and the defendant's

reply is cited as "Def.'s Resp. Add'l Facts ¶ ___." All properly supported material facts set forth in either party's statements are deemed admitted unless properly controverted. *See* Local Rule 12(M) and (N)(3)(b); *see also Flaherty v. Gas Research Inst.*, 31 F.3d 451, 453 (7th Cir.1994). Moreover, the mere denial of a particular fact without specific references to affidavits, parts of the record, and other supporting materials is insufficient, and, where a properly supported factual assertion is met with such a naked denial, the fact may be deemed admitted. *Flaherty*, 31 F.3d at 453.

2. Green's offer letter to Savino stated: "On behalf of Bill Popper, I am pleased to offer you the position of Maintenance Clerk at The C.P. Hall Company." Pl.'s App.Ex. B.

3. C.P. Hall had a second facility located in Bedford Park referred to as the "7300 facility".

United States?", by stating "yes, [Savino], and I would like to get on top of it and suck it," Def.'s Facts ¶ 54; Pl.'s Add'l Facts ¶ 20; 6) attempted to give Savino neck rubs, Pl.'s Add'l Facts ¶ 22; 7) viewed a Playboy magazine in her presence, *id.* ¶ 23; 8) called Savino at home and asked her to watch him umpire baseball games, *id.* ¶ 24, and drove by Savino's house, *id.* ¶ 21; 9) "volunteered" Savino to be secretary of the Safety Committee, so that they "could be together," Pl.'s Add'l Facts ¶ 27; Pl.'s Dep. at 186; and 10) often made disparaging remarks about his wife and marriage, Pl.'s Add'l. Facts ¶ 50. Savino informed Popper in no uncertain terms that his comments and advances were unacceptable. Pl.'s Add'l Facts ¶¶ 15, 20.

Then, in an incident that Savino claims further aggravated the situation, Popper attempted to force Savino to go out to dinner with him while his wife was out of town. Despite her repeated refusals, Popper persisted, insisting that she join him for dinner. Savino ultimately enlisted the aid of co-worker Mark Randazzo, who met Savino in the office at the end of the workday. Undeterred, Popper told Mr. Randazzo that he was excused, and blocked Savino's exit, insisting that "we'll go out to dinner tonight." Pl.'s Add'l Facts ¶¶ 29–32, 74; Def.'s Facts ¶ 249. Savino was able to leave the office, but felt compelled to call Popper later that evening to confirm that the two would not be having dinner together. Instead, Savino and Randazzo went for coffee, and Savino suspected that Popper followed them.

Savino contends that declining Popper's dinner invitation was the last straw as far as Popper was concerned and, as a result, he began a campaign to discredit her work. Specifically, Popper unjustifiably criticized her work, unnecessarily reminded her to do her basic job duties, withheld work orders from Savino and then blamed her for not closing them, ripped up her time card (claiming it was irrelevant because Savino did not make enough money anyway), made snide remarks, did not let her turn on the office air-conditioner, left her "unprofessional" notes, and generally acted like a "jealous boyfriend." Pl.'s Add'l Facts ¶¶ 38–41; Def.'s Facts ¶ 55; Pl.'s Dep. at p. 176. Before he pressured Savino to join him for dinner, Popper allegedly told Savino that he would speak to the plant manager about obtaining health benefits for her. But after Savino declined his dinner request, Popper claimed he could not intervene on her behalf. Pl.'s Add'l Facts ¶ 42; Def.'s Facts ¶ 153.

While these incidents greatly upset Savino, she initially did not report her supervisor because she was afraid of being perceived as a troublemaker. *Id.* ¶¶ 15–17, 20–21. In addition, Popper had warned Savino that they would both lose their jobs if Savino filed a complaint against him. Pl.'s Add'l Facts ¶¶ 48–50. Savino decided that the best course of action was to transfer out of Popper's department. Savino notified Green in the Human Resources Department of her interest in two posted positions. Green called Savino back and left a message for Savino with Popper concerning one of the positions, but Popper allegedly hid the message and Savino did not discover the note until the following day. Savino eventually interviewed for this position, but it was offered to another candidate with better qualifications. Pl.'s Add'l Facts ¶¶ 43–45.

*Savino's July 1995 Complaint to C.P. Hall*

Because Savino was not offered either of the posted positions, making a transfer out of Popper's department unlikely, she decided that her only option was to file a formal complaint against Popper. On July 26, 1995, Savino informed Leslie Mullin, Plant Manager and Popper's supervisor, of the numerous incidents of Popper's harassment. In response, Mullin gave Savino a copy of C.P. Hall's sexual harassment policy (Pl.'s Add'l Facts ¶¶ 46–47; Def.'s Facts ¶ 52, 57–58) and notified Green and James Roach, Corporate Manager of Human Resources, of Savino's complaint. Def.'s Facts ¶¶ 8, 59.

The following day, Savino met with Green and described the offensive incidents, including Popper's conduct after Savino declined his dinner invitation. *Id.* ¶¶ 65–68, 71–73, 76–80. Green prepared detailed written notes of her meeting with Savino. Green's notes indicate that Popper had warned Savino that they would lose their jobs if she told anyone about his behavior, (Pl.'s Add'l Facts ¶¶ 48–50) and that Savino's main goal was to "get away from [Popper]." *Id.* ¶ 51. Savino requested that Popper be told about her

complaints, although it is disputed whether Savino agreed to continue working for Popper if necessary. Pl.'s Add'l Facts, ¶ 51; Pl.'s App.Ex. C. After her meeting with Savino, Green reported the substance of their discussion to Roach. Def.'s Facts ¶ 85.

On July 28, 1995, Roach and Mullin met with Popper to discuss Savino's complaint. Def.'s Facts ¶ 86. While Popper denied certain incidents (*Id.* ¶ 93), he admitted that he discussed his marital problems with Savino, sometimes stared into space, "jokingly" tore up Savino's time card, replaced the printer paper near Savino's desk, called Savino at home (although the purpose of these calls is disputed), and that he asked her out to dinner. *Id.* ¶¶ 90–92, 94, 97–99, 101. In addition to interviewing Popper, Mullin interviewed Brian Shimizu, an employee in the maintenance department, who had overheard Popper ask Savino for a back rub. Def.'s Facts ¶¶ 119, 121. Roach concluded that while there had been some occasional vulgar language between Popper and Savino (although Savino denied using vulgar language around Popper), the evidence failed to substantiate Savino's complaint. Def.'s Facts ¶¶ 107, 111; Pl.'s Facts ¶ 107.

At the conclusion of the investigation, Roach gave Popper a "strong verbal warning" that Savino's complaint was a serious charge and that a substantiated charge of sexual harassment could lead to disciplinary action, including discharge. Roach informed Popper that he had engaged in unprofessional conduct and poor judgment, that Popper's further dealings with Savino should be strictly professional, and that "this type of problem" would not be tolerated. *Id.* ¶¶ 108, 112. Popper responded that he understood Roach's warning and there would be no further problems. *Id.* ¶¶ 109. Popper did not receive a written warning at that time, but was told that if Savino's allegations were substantiated, he would receive a written reprimand. *Id.* ¶ 129. Roach allegedly informed Savino that her complaint would be aggressively and appropriately dealt with, and if she suffered any retribution by Popper, she should so inform someone at C.P. Hall. *Id.* ¶ 122. However, C.P. Hall failed to inform Savino of the status or outcome of the investigation. Pl.'s Add'l Facts ¶¶ 56, 69; Def.'s Facts ¶¶ 123, 228.

Recognizing a need to "separate" Popper and Savino, Roach and Mullin moved Savino out of Popper's office to an area in the accounting department just outside Mullin's office. Def.'s Facts ¶¶ 113, 117. Although Savino was separated from Popper, he remained her supervisor and gave her work assignments. Pl.'s Add'l Facts ¶¶ 52, 53; Def.'s Facts ¶ 130. Furthermore, although Popper was supposed to send Savino's assignments through inter-office mail, he brought them directly to Savino. Def.'s Facts ¶ 132; Pl.'s Add'l Facts ¶¶ 52, 62; Pl.'s Dep. at 143.

Unlike her office in the maintenance department, Savino's new work station did not have a telephone. Def.'s Facts ¶ 136; Pl.'s Add'l Facts ¶ 54. Although Savino was not displeased with her new surroundings, she felt like she was being "watched" because she was placed just outside of Mullin's office. Pl.'s Add'l Facts ¶ 52. However, the aesthetics of Savino's office surroundings were much improved. While bare floors in the maintenance office were stained with grease and oil, her new office was carpeted, had better heating and air conditioning, and did not require Savino to wear a hard hat. Def.'s Facts ¶¶ 116, 158–59.

In October 1995, the beginning of C.P. Hall's fiscal year and approximately seven months after Savino's start date, Savino's hours were increased from 20 hours per week to 25 hours per week. This increase enabled Savino to receive employment benefits such as health insurance, at a cost to C.P. Hall of approximately $3.46 an hour. Def.'s Facts ¶ 156–157; Pl.'s Add'l Facts ¶ 53. Savino claims that she was allowed to work the additional five hours for the accounting department, Pl.'s Add'l Facts ¶ 53, but remained under Popper's supervision for the remaining twenty hours. *Id.* Despite this, Savino claims that Popper inappropriately withheld safety gift certificates from Savino, using the false excuse that Savino was no longer in his department. *Id.* ¶¶ 77–80.

In an effort to determine whether Popper had been punished following the 1995 investigation, Savino contacted Green and Mullin requesting copies of notes taken during the investigation. Def.'s Facts ¶ 175; Pl.'s Add'l

Facts ¶¶ 63, 65. Green showed Savino some of her notes, which revealed that Popper had been issued a verbal warning, but did not allow Savino to copy them. Pl.'s Add'l Facts ¶ 66.

*Savino's April 1996 Complaint to C.P. Hall*

In April 1996, Savino complained that Popper was continuing to harass her. Savino informed Mullin that other employees had heard Popper refer to Savino as a "bitch" and as a "blonde whore from hell," and that Popper left her notes unfairly critical of her job performance. Def.'s ¶¶ Facts 160–163; Pl.'s Add'l Facts ¶¶ 60, 61, 64. Mullin informed Savino that he would investigate her accusations and immediately informed Roach of Savino's complaint. Def.'s Facts ¶¶ 166–167.

In response to Savino's latest complaint, Mullin arranged for two separate meetings— one between Mullin and Popper, and the other between Green and Savino. *Id.* ¶¶ 168, 174, 176–178. During Mullin's meeting with Popper, Popper admitted that "perhaps" he had referred to Savino as a "bitch" a few times, and at least once as a "blonde whore." *Id.* ¶¶ 169, 193. During Savino's meeting with Green, Savino disclosed an "unprofessional" note that Popper had left her. *Id.* ¶ 179. Savino requested a meeting with Roach, Mullin, and Popper so that she could confront Popper with her accusations, Pl.'s Add'l Facts ¶ 67, and asked to be transferred from Popper's department. Pl.'s Add'l Facts ¶ 71. Green told Savino that she believed Popper's behavior was inappropriate, and that if it were up to her, Green would have "gotten rid of Popper a long time ago." Def.'s Facts ¶ 182; Pl.'s Add'l Facts ¶ 65. However, Savino was told she had to remain working in Popper's department, and Green never responded to Savino's request for a face-to-face meeting.

Numerous coworkers were interviewed as part of C.P. Hall's investigation of Savino's April 1996 complaint. Def.'s Facts ¶¶ 184, 190, 239. One of these coworkers, Mark Randazzo, corroborated Savino's claim that Popper was making disparaging remarks about Savino. Def.'s Facts ¶¶ 184, 251; Pl.'s Add'l Facts ¶¶ 72, 73. During this investigation, Randazzo also corroborated some of the allegations Savino made during the July 1995 investigation, specifically, that Popper re-

strained Savino from leaving the office without first accepting his dinner invitation, that Popper apparently followed Savino and Randazzo when they went out for coffee, and that Savino felt compelled to purchase a tape recorder to "catch" Popper's inappropriate remarks on tape. Pl.'s Add'l Facts ¶¶ 75–76; Pl.'s App.Ex: G. C.P. Hall had not interviewed Randazzo during the July 1995 investigation.

On May 10, 1996, Mullin, Green, and Roach met with Popper and informed him that his "dinner date" invitation in 1995 was "unprofessional," and his disparaging comments about Savino showed "poor judgment" on his part. As a result, they suspended Popper for one week without pay. Def.'s Facts ¶¶ 195–196, 198. Prior to the suspension, however, Savino had filed a complaint against C.P. Hall with the E.E.O.C. Savino believes that C.P. Hall would not have taken this disciplinary stance in the absence of her E.E.O.C. complaint. After receiving the E.E.O.C.'s notice of a right to sue, Savino filed this suit.

*C.P. Hall's Alleged Retaliation*

As a result of her complaints, Savino contends that she suffered retaliation. First, Savino asserts C.P. Hall failed to give her a raise on her anniversary date, April 1, 1996, because she complained against Popper. When Savino raised the issue with Mullin, however, he explained that C.P. Hall implements annual raises at the beginning of its fiscal year, in October, and not on the anniversary dates of employment. *Id.* ¶ 236. Mullin noted that the benefits Savino received in October 1995 were considered a raise and, as such, Savino was an exception to C.P. Hall's general practice of denying raises to part-time employees employed less than a full year. Def.'s Facts ¶¶ 172, 173; Pl.'s Facts ¶ 171; Pl.'s Add'l Facts ¶ 55 It is undisputed that C.P. Hall neglected to inform Savino that the benefits were awarded in lieu of a raise. However, C.P. Hall demonstrates that it had engaged in a similar practice in the past. As an example, C.P. Hall points to another part-time employee who did not receive a raise at the beginning of the fiscal year because she was employed for less than one year. This other employee

received benefits in lieu of a raise the following year, and finally received her first raise 25 months after she was hired. Def.'s Facts ¶ 243. C.P.

Savino then charges that C.P. Hall wrongfully withheld two accounting positions from her. Savino claims that she was not able to apply for an accounting position that became available shortly after her 1995 complaint because it was never posted, even though Roach knew that Savino wanted to be transferred from Popper's department. Pl.'s Add'l Facts ¶ 81. Savino also expressed interest in an accounting position that became available in 1996, shortly before her April 1996 complaint.

The first position, Regional Accountant at C.P. Hall's 7300 facility, became available and was filled in September 1995. Zielinski Aff. ¶ 3. The position was filled after Gary Zielinski, C.P. Hall's Regional Manager, was directed to reduce his "headcount" at the 7300 facility for the 1996 fiscal year, which began in October 1995. Def.'s Facts ¶ 200. Prior to posting the vacancy, Zielinski contacted Roach and asked if he could move Maria Morrow, who had a degree in Business Administration and two years' experience under Zielinski, into the Regional Accountant position. Def.'s Facts ¶ 200; Pl.'s Add'l Facts ¶ 82; Pl.'s App.Ex. I at KS 438. Roach agreed and Morrow was moved into the Regional Accountant position to reduce Zielinski's headcount. Def.'s Facts ¶ 200. Zielinski—who worked at another facility—did not know of Savino or her July 1995 complaint at the time he requested the transfer for Morrow. Zielinski Aff. ¶ 6.

The second opening was the Plant Accountant position at the 5851 facility. The position became available when Shirly Majewski decided to retire. Pl.'s Add'l Facts ¶ 85. Although Majewski did not have a college degree when she held the position, Linda Martinek, Assistant Controller for C.P. Hall, decided to upgrade the position to require a four-year college degree in accounting, two years' experience in a manufacturing environment, and preferably some supervisory experience. Def.'s Facts ¶ 212; Pl.'s Add'l Facts ¶ 86; Martinek Aff. ¶ 5. Martinek did not post the position internally because she did not believe that any current employees were qualified to fill the vacancy. Def.'s Facts ¶ 210.

Although Savino did not yet have her degree in accounting (but would receive it in August 1996), she did have some experience in accounting and arguably would have qualified for the position under the old job description. Def.'s Facts ¶¶ 12–14, 16, 33–35, 207; Pl.'s Facts ¶¶ 12, 14; Pl.'s Add'l Facts ¶¶ 2, 87. In April 1996, Martinek began the interview process, interviewing eight to twelve candidates. Def.'s Facts ¶¶ 213, 218. Although Martinek had concerns that Savino was not qualified for the position, she agreed to interview Savino if time permitted. Id. ¶¶ 215–216. She first attempted to do so after Savino had already left for the day. Id. ¶ 217. On a later occasion, Green approached Savino about interviewing that day, but Savino claimed that she was not prepared and did not want the interview just to be pacified. Def.'s Facts ¶ 219; Pl.'s Add'l Facts ¶ 88. Ed Wier, an accountant with a four-year degree and ten years of experience, a candidate admittedly more qualified than Savino, was ultimately selected for the position. Def.'s Facts 221; Pl.'s Add'l Facts ¶ 89. It is undisputed that Martinek did not learn of Savino's complaints against Popper until May 1996, after Martinek had upgraded the job's requirements. Def.'s Facts ¶ 224.

*C.P. Hall's Sexual Harassment Policy*

In 1993, Roach distributed C.P. Hall's sexual harassment policy to all managers and supervisors, instructing them to disseminate the sexual harassment policy at group meetings. Def.'s Facts ¶¶ 45, 49–50. The policy is also posted at all C.P. Hall facilities. Id. ¶ 44. Under the policy, an employee may complain of sexual harassment to the corporate human resources department, his or her supervisor, or any other C.P. Hall employee. However, the corporate human resources department must be notified of any complaint and is ultimately responsible for investigating the charges. Id. ¶¶ 46–48, 229, 231, 232. The investigation entails interviewing the complainant and pertinent witnesses, and reserves remedial action until the close of the investigation. Id. ¶¶ 233–235.

There is no indication that anyone attempted to disseminate C.P. Hall's sexual

harassment policy to employees who started with the company after 1993, or that Savino was aware of C.P. Hall's sexual harassment policy until she complained to Mullin in July 1995, when he showed her a copy of the policy. Pl.'s Add'l Facts ¶ 47. Savino did not complain until to the end of July 1995 because she was a new employee and did not want to be perceived as a "trouble-maker" or "instigator," and she "needed the position." Def.'s Facts ¶ 257; Pl.'s Add'l Facts ¶ 12; Pl.'s Dep. at 59.

## DISCUSSION

### A. Summary Judgment Standards

Summary judgment is proper if the record reveals no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.*, 40 F.3d 146, 150 (7th Cir.1994). A genuine issue for trial exists only when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The Court must view the evidence in a light most favorable to the nonmoving party, drawing all reasonable inferences in the nonmovant's favor. *Cincinnati Ins.*, 40 F.3d at 150. However, if the evidence is merely colorable, or is not significantly probative, or merely raises "some metaphysical doubt as to the material facts", summary judgment may be granted. *Liberty Lobby*, 477 U.S. at 261, 106 S.Ct. at 2516. In an employment discrimination suit, where credibility and intent are crucial issues, these standards are applied with added rigor. *See Courtney v. Biosound*, 42 F.3d 414, 418 (7th Cir.1994). Finally, credibility determinations and weighing evidence are jury functions, not those of a judge when ruling upon a motion for summary judgment.

### B. Sexual Harassment

■ Title VII prohibits "discrimination]... against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex...." 42 U.S.C. § 2000e–

2(a)(1). Almost twelve years ago, the Supreme Court determined that Title VII encompasses two types of sexual harassment: hostile work environment and quid pro quo. *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). The Court announced that employer conduct that "has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment" creates a "hostile working environment" actionable under Title VII. *Meritor*, 477 U.S. at 65, 106 S.Ct. at 2404 (quoting 29 C.F.R. § 1604.11(a)(3) (1985)). Quid pro quo harassment occurs when a supervisor conditions job benefits upon submission to sexual demands. *See Bryson v. Chicago State University*, 96 F.3d 912 (7th Cir.1996). What conduct falls within each category, and the proper standard of employer liability for such behavior have continually remained controversial issues.

■ The difficulty in articulating definite standards is no more evident than in the Seventh Circuit's recent en banc decision in *Jansen v. Packaging Corp. of America*, 123 F.3d 490 (7th Cir.1997).[4] Despite the diverging viewpoints, the court was able to forge a majority on two critical principles: first, the standard for employer liability in hostile work environment cases is negligence, and second, liability for quid pro quo harassment is strict, even in the absence of what the court referred to as a "company act". *Id.* at 495. Both types of harassment are at issue in the instant case. We begin our analysis with a discussion of the troublesome law which surrounds the important issue of quid pro quo harassment.

### 1. Quid Pro Quo Harassment

A thorough analysis of the Seventh Circuit's current position on quid pro quo harassment requires an examination of the theory's development, beginning with the seminal sexual harassment case *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). In *Meritor*, the United States Supreme Court reject-

---

4. The court consolidated *Jansen* with *Ellerth v. Burlington Indus., Inc.*, and issued the plurality opinion and seven separate concurrences and/or dissents.

ed an employer's contention that its former employee could not recover for sexual harassment because she failed to allege an economic injury. 477 U.S. at 64, 106 S.Ct. at 2404. The employer argued that, in enacting Title VII, Congress intended to eliminate only the "economic barriers erected by discrimination", not to compensate for the "purely psychological aspects of the workplace environment." *Id.* (citations omitted). The Court read no such limitation in either the language or the legislative history of Title VII. To the contrary, the Court found that Congress intended " 'to strike at the entire spectrum of disparate treatment of men and women,' " which included eradicating behavior resulting in non-economic injuries. *Id.* (citations omitted). The Court remanded the action to the district court to determine whether the employer was liable for the creation of a hostile work environment. *Id.* at 68, 106 S.Ct. at 2406.

*Meritor* left a number of questions unanswered, however. Most significantly, the Court failed to fully delineate the parameters of actionable quid pro quo harassment, and rejected the parties' invitation to define the standard for employer liability in sexual harassment cases. As to the quid pro quo question, however, the Court noted that the E.E.O.C.'s Guidelines on Sexual Harassment "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Meritor,* 477 U.S. at 65, 106 S.Ct. at 2404 (quoting *General Elec. Co. v. Gilbert,* 429 U.S. 125, 141–42, 97 S.Ct. 401, 410–11, 50 L.Ed.2d 343 (1976)). The E.E.O.C.'s Guidelines on Sexual Harassment describe quid pro quo harassment as follows:

> Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when 1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment .... [or] 2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual.

29 C.F.R. § 1604.11(a).

Despite the Supreme Court's directive, many circuits employ a five-part test to determine whether a plaintiff has established

quid pro quo harassment. Under this test, the plaintiff must demonstrate that: 1) she is a member of a protected group; 2) the sexual advances were unwelcome; 3) the harassment was sexually motivated; 4) the employee's reaction to the supervisor's advances affected a tangible aspect of her employment; and 5) respondeat superior has been established. *See, e.g., Chamberlin v. 101 Realty, Inc.,* 915 F.2d 777, 783 (1st Cir.1990); *Spencer v. General Elec. Co.,* 894 F.2d 651, 658 (4th Cir.1990); *Jones v. Flagship Int'l,* 793 F.2d 714, 721–22 (5th Cir.1986); *Highlander v. K.F.C. Nat'l Mgmt. Co.,* 805 F.2d 644, 649 (6th Cir.1986). Initially, some circuits interpreted the fourth element of the test rather stringently, requiring the plaintiff to demonstrate the loss of an economic job benefit such as being fired, demoted, etc., to state a claim of quid pro quo harassment. *See, e.g., Kotcher v. Rosa and Sullivan Appliance Ctr.,* 957 F.2d 59, 62 (2nd Cir.1992).

While not officially adopting this test, the Seventh Circuit had conceded that the five-factor test provides a "useful framework" for quid pro quo analysis. *Bryson v. Chicago State University,* 96 F.3d 912, 916 (7th Cir. 1996). However, the court interpreted the fourth element of the test in a fairly broad manner. In *Bryson,* the Seventh Circuit reviewed a professor's claim that she suffered quid pro quo harassment, pointing to the loss of her title and her banishment from university committee work when she rejected her superior's advances. The court found that the plaintiff easily established the first three elements of the test, and focused upon the fourth, critical element—what tangible aspect of the plaintiff's employment was adversely affected. *Id.* Noting that a wide variety of actions can qualify, the Seventh Circuit rejected the trial court's limitation of "adverse employment action" to denials of promotions, demotions, and terminations. *Id.* The court found that the plaintiff's loss of title and removal from committee work took her off of a promising career track, and satisfied the fourth element of the five-part test. *Id.*

Shortly thereafter, the Seventh Circuit broke ranks with those circuits requiring the denial of an economic job benefit in a quid pro quo action, focusing instead upon the

first type of quid pro quo harassment set forth in the E.E.O.C.'s Guidelines—the implicit or explicit threat. A majority of the court in *Jansen* ruled that an adverse job consequence is not necessary to raise a cognizable claim of quid pro quo harassment in the face of an unambiguous threat.[5] 123 F.3d at 499 (Flaum, J., concurring), 123 F.3d at 579 (Wood, J., concurring).

Writing for a plurality of the court,[6] Judge Flaum reasoned that "a clear and serious quid pro quo threat alters the 'terms and conditions' of employment in such a way as to violate Title VII and therefore can constitute an actionable claim even if the threat remains unfulfilled." 123 F.3d at 499 (Flaum, J., concurring). Noting that the 1991 amendments to the Civil Rights Act enabled employees to obtain compensation for emotional harm, the plurality discounted prior emphasis upon the economic quo. *Id.* The plurality explained that "[a] supervisor's unambiguous communication that adverse job action is imminent if sexual favors are not forthcoming causes the employee real emotional strife. An employee who does not submit may well undergo anxiety, distress, and loss of productivity regardless of whether the threat is carried out." *Id.* at 500. Judge Flaum found that a supervisor's threat of an adverse job action is as much an exercise of his delegated authority as is the supervisor's act in carrying out the threat. *Id.* at 499. Consequently, the requirement that the supervisor actually follow through with the threat is superfluous.

The plurality further determined that Title VII's primary objective of deterrence is best served by imposing strict liability upon the employer in quid pro quo cases. *Id.* at 502. The court found that when a supervisor de-

liberately conditions job benefits upon fulfilling a demand of a sexual nature, the harassment stems from the authority the company delegates to the supervisor. *Id.* at 499. Judge Flaum noted that seven other circuits have similarly imposed vicarious liability in cases of a supervisor's quid pro quo harassment.[7] *Id.*

In his concurrence, Judge Cudahy emphasized that a fair interpretation of *Meritor* required the courts to distinguish between claims of quid pro quo and hostile work environment harassment. 123 F.3d at 504 (Cudahy, J., concurring). Judge Cudahy explained that "[i]n a quid pro quo situation, a supervisor acts with actual or apparent authority when he promises employment goodies or threatens their withdrawal to extract sexual 'cooperation .' Quid pro quo is always a creature of *power* . . . . A hostile environment, on the other hand, can be created by persons of equal, or even inferior, status to the victim." *Id.* (emphasis added). Finding quid pro quo the more insidious form of harassment, Judge Cudahy advocated strict liability as a means of encouraging employers to take proactive measures. *Id.* at 504–05. *See also* Stacey Dansky, *Eliminating Strict Employer Liability in Quid Pro Quo Sexual Harassment Cases*, 76 Tex.L.R. 435, 439 (1997) (describing quid pro quo harassment as "sexual blackmail").

Dissenting from the majority, Chief Judge Posner and Judges Coffey and Manion agreed that an employer is strictly liable for quid pro quo harassment, but found that actionable quid pro quo harassment occurs only where there is a company act. 123 F.3d at 513 (Posner, C.J., dissenting); 123 F.3d at 517 (Coffey, J., dissenting). Under the dis-

---

**5.** Judges Flaum, Bauer, Cummings, Evans, Cudahy, Kanne, Wood, and Rovner agreed that a threat may be sufficient to alter the terms and conditions of employment.

**6.** Judges Bauer, Cummings, Evans, Cudahy (in part), and Kanne (in part) joined in Judge Flaum's opinion. Judge Kanne concurred in Judge Flaum's opinion, except with regard to two important issues. First, Judge Kanne found that an employer should not be strictly liable for quid pro quo harassment. Second, Judge Kanne disagreed with Judge Flaum's "heightened duty of care" when a hostile work environment is created by a supervisor.

**7.** *See, e.g., Davis v. City of Sioux City*, 115 F.3d 1365, 1997 WL 329583 at *2 (8th Cir. June 18, 1997); *Nichols*, 42 F.3d at 513–12 (9th Cir .1994); *Bouton v. BMW of N. Am., Inc.* 29 F.3d 103, 106–07 (3d Cir .1994); *Karibian v. Columbia Univ.*, 14 F.3d 773, 777 (2d Cir.) *cert. denied*, 512 U.S. 1213, 114 S.Ct. 2693, 129 L.Ed.2d 824 (1994); *Sauers v. Salt Lake County*, 1 F.3d 1122, 1127 (10th Cir.1993); *Kauffman v. Allied Signal, Inc.*, 970 F.2d 178, 185–85 (6th Cir.), *cert. denied*, 506 U.S. 1041, 113 S.Ct. 831, 121 L.Ed.2d 701 (1992); *Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1316 (11th Cir.1989).

senters' approach, unfulfilled threats or an employee's submission to quid pro quo threats would not require imposition of strict liability. Unless the supervisor carries out his threat by either terminating, demoting, transferring, or withholding other tangible benefits from the employee (that is, by committing a company act), the employer has no practical way of knowing about the act, and therefore shouldn't be held strictly liable. *See* 123 F.3d at 514–15 (Posner, C.J., dissenting).[8] Judge Manion further explained that requiring an adverse job consequence truly preserves the distinction between quid pro quo harassment and hostile work environment. 123 F.3d at 557–58 (Manion, J., dissenting).

Judge Wood, however, disagreed with the panel's attempts to distinguish quid pro quo from hostile work environment claims, finding the distinctions to be largely artificial. 123 F.3d at 568–69 (Wood, J., concurring). Accordingly to Judge Wood, "[t]he critical question, for purposes of employer liability, turns on whether the supervisor has abused the powers the employer has entrusted to him; it does not turn on the way in which the supervisor has decided to abuse them." *Id.* at 567. Rather, Judges Easterbrook, Rovner, and Wood found that respondeat superior should be utilized in determining employer liability, regardless of the type of sexual harassment, when committed by a supervisor. *Id.* at 570–71. Whereas Judge Easterbrook found that only a "company act" distinguishes between quid pro quo and hostile working environment (albeit unnecessarily, if the majority adopted his respondeat superior approach), 123 F.3d at 559 (Easterbrook, J., concurring in part and dissenting in part), Judges Wood and Rovner agreed with the Flaum plurality that a threat is sufficient to set forth a quid pro quo claim. 123 F.3d at 579 (Wood, J., concurring).

■ From these various opinions we can draw the following two conclusions about the current law in the Seventh Circuit: 1) actionable quid pro quo harassment occurs when a supervisor threatens to withhold job benefits or to impose job detriments unless the em-

ployee satisfies the supervisor's sexual demands; and 2) regardless of whether the employee submits to the threats or successfully calls the supervisor's bluff, the employer is strictly liable under a quid pro quo theory of sexual harassment.

The *Jansen* majority's application of these two principles provides guidance in our analysis. In writing for the plurality, Judge Flaum stated that Jansen's supervisor made a cognizable quid pro quo threat by telling Jansen that "I haven't forgotten your review, its on my desk," while patting his crotch. 123 F.3d at 503 (Flaum, J., concurring). Admittedly, Jansen's supervisor did not directly request sexual favors in exchange for the favorable review. And Jansen eventually received both a good review and a raise without submitting to her supervisor's sexual requests. However, the majority determined that a jury could find both that Jansen's supervisor was conditioning a good review upon her submission to his sexual requests, and that her supervisor's act in making the demand was sufficient to alter the terms of Jansen's employment. *Id.*

■ The instant case presents the flip-side of the threat made in *Jansen.* While Jansen's supervisor did not explicitly reference a sexual request, Popper did not explicitly offer a job-related "or else" with his dinner invitation. The critical issue is whether a jury could reasonably find that Popper was threatening the terms and conditions of Savino's employment by blocking her exit from the office and telling her that she would be joining him for a private dinner while his wife was out of town. We note that in doing so, Popper was not harassing Savino in a coworker like manner. Instead, Popper was exercising his authority as a supervisor—as evidenced by his dismissal of Mark Randazzo from the office and telling, not asking, Savino to join him for dinner. While it would not be an impermissible leap in logic for a jury to infer the "or else" implicit in Popper's demand, we find that Savino more forcefully states a claim under second half of the E.E.O.C.'s definition of quid pro quo harass-

---

8. Judge Posner's concern with providing the employer with notice of the discrimination is reflected most recently in "Eliminating Strict Employer Liability in Quid Pro Quo Sexual Harassment Cases", where the author claims that "employers have a heightened incentive to act under notice liability." 76 Tex.L.R. 435, 455 (1997)

ment. In light of recent caselaw in this circuit, Savino has presented sufficient evidence of an "adverse job action" to establish quid pro quo harassment.

In the short period since the Seventh Circuit's decision in *Jansen*, few courts within this Circuit have visited the issue of quid pro quo sexual harassment. However, a review of the caselaw indicates a less rigid definition of the term "adverse job action". For example, in a Title IX case, the Seventh Circuit stated that " 'quid pro quo' harassment occurs when the receipt of benefits or the *maintenance of the status quo* is conditioned on acquiescence to sexual advances." *Mary M. v. North Lawrence Community Schl. Corp.*, 131 F.3d 1220, 1226 n.7 (7th Cir.1997) (emphasis added). While the "maintenance of the status quo" indicates a more liberal view of what constitutes the "quo", the Seventh Circuit did not further define the phrase.

However, a recent district court in Indiana held that a the loss of a pleasant working environment can constitute an "adverse job action" where the harasser's sexual request alone was not so clear and unambiguous as to alter the terms and conditions of the plaintiff's employment. In *Davis v. Palmer Dodge West, Inc.*, 977 F.Supp. 917, 923 (S.D.Ind.1997), the court held that sufficient evidence supported the plaintiff's contention that her supervisor engaged in quid pro quo harassment first by making sexual advances, and then by criticizing the plaintiff unjustifiably and discriminatorily enforcing workplace rules. The court was untroubled that the plaintiff's supervisor did not terminate or demote her, finding instead that the supervisor had conditioned a "pleasant working environment" upon submission to his sexual requests. *Id.* at 925. Similarly, in *Hawthorne v. St. Joseph's Carondelet Child Ctr.*, 1997 WL 677081 *4 (N.D.Ill.1997), Judge Shadur acknowledged that non-economic penalties such as being forced to work alone, not being notified of staff meetings, and unwarranted criticism could constitute "material job detriments."

To the extent that some courts have limited the scope of quid pro quo liability by using a narrow definition of "adverse job action," the decisions are inconsistent with the current law in this Circuit. For example, in *Robinson v. City of Pittsburgh*, the Third Circuit found that in the absence of evidence that a supervisor was implicitly or explicitly conditioning job benefits upon submission to sexual demands at the time he issued the threat, the employee must demonstrate that her rejection of the invitation was "used as the basis for employment decisions affecting such individual." 120 F.3d 1286, 1296 (3d Cir.1997) (quoting 29 C.F.R. § 1604.11(a)(2). Consequently, the *Robinson* court found the supervisor's unjustified reprimands, harsh words, unsolicited phone calls, and negative comments regarding an employee's work, after the employee rejected the supervisor's advances, did not rise to the level of "conduct affecting [the employee's] 'compensation, terms, conditions, or privileges' or employment." [9] 120 F.3d at 1298 (citations omitted). However, in this Circuit such conduct is actionable because it sufficiently alters the status quo by removing the plaintiff's pleasant working environment.

■ We conclude that the authority in this Circuit establishes that the maintenance of a professional and pleasant working environment squarely falls within the realm of the "terms, conditions, and privileges of employment." *See Bryson*, 96 F.3d at 916. To find otherwise would ignore Justice Marshall's admonition that "[a] supervisor's responsibilities do not begin and end with the power to hire, fire, and discipline employees, or with the power to recommend such actions. Rather a supervisor is charged with the day-to-day supervision of the work environment and with ensuring a safe, productive workplace." *Meritor*, 477 U.S. at 76, 106 S.Ct. at 2410 (Marshall, J., concurring). When a supervisor conditions the maintenance of a professional and pleasant work environment upon an employee's submission to his sexual demands, he is engaging in quid pro quo harassment to the same extent as if he conditioned the submission upon continued employment. In both cases, the supervisor is exercising his power and control over the

---

9. While the court ultimately found other evidence supporting the plaintiffs claim sufficient, the court determined that the supervisor's harsh words lacked real consequence and were therefore unactionable.

employee and her workplace to extract sexual favors. Moreover, with the Seventh Circuit's abandonment of the "company act" requirement in *Jansen* (which allegedly carried the indicia of notice to the employer) we find no tenable reason to differentiate quid pro quo claims based upon the nature (as opposed to the severity) of the threatened job action.

A reasonable jury could find that Savino has presented ample evidence that Popper's behavior following her refusal to join him for dinner adversely affected the terms and privileges of her employment. For example, after Savino refused Popper's dinner request, he tore up her time card, he "nitpicked" her minor errors, demeaned her job and her performance, blamed her for not closing work orders that she never received, withheld safety gift certificates to which she was entitled, refused to intervene on her behalf regarding a request for employment benefits, and "hid" a note concerning Savino's attempt to transfer out of his department. *See* Pl.'s Add'l Facts ¶¶ 38–40, 42, 44, 77–80. In an apparent effort to maintain his control over Savino, Popper then warned her that they would both lose their jobs if she reported his behavior. His demeanor had changed in tone—instead of following, teasing, and insisting that Savino join him for lunch or dinner, he began badgering and belittling her abilities, perhaps exercising the unspoken "quo" in his most forceful dinner request.

While these actions may walk a fine line between quid pro quo and hostile work environment harassment due to the veiled nature of Popper's "threat," we cannot say as a matter of law that a reasonable jury could not view Popper's actions as an attempt to condition a job benefit or the absence of a job detriment—such as getting paid, receiving safety certificates, transferring to a different department, preserving one's reputation as a competent worker, and maintaining a professional and pleasant working environment—on submission to Popper's advances. Furthermore, the close temporal nexus between Savino's refusal and Popper's subsequent actions further bolsters Savino's claim. *See Jansen*, 123 F.3d at 559 (Manion, J., concurring and dissenting) (the closer the nexus between the sexual advance and adverse job consequence, the more likely the case in-

volves quid pro quo harassment). As such, we find that Savino has set forth sufficient evidence of a sexual request, and that Popper used her rejection as the basis for employment decisions affecting her.

■ This is not the end of our inquiry, however, as liability for quid pro quo threats will not attach "where a victim or plaintiff could not have reasonably believed that it was within the supervisor's power to affect the conditions of the plaintiff's job." *Id.* at 500 (Flaum, J., concurring) (citing *Restatement (Second) of Agency* § 219(2)(d)). This exception recognizes that an employer may be held liable even if the supervisor's threat "exceeds his actual authority, but the victim reasonably relies on the supervisor's threat because of his apparent authority" to alter the terms and conditions of the employee's workplace. *Jansen* at 500 (Flaum, J., concurring).

■ C.P. Hall responds that Popper merely had the authority to *recommend* Savino's termination, disciplinary actions or wage increases. This does not change the result. Regardless of whether Popper had *actual* authority to hire, fire or reprimand Savino, a jury could certainly find that Savino reasonably believed that Popper had such authority. *Id.* For instance, Savino interviewed only with Popper; her "offer" letter stated that she was being offered the job "[o]n behalf of Bill Popper;" and Savino worked predominantly with Popper. Popper gave Savino her work assignments and supervised her work. Even after Savino complained to others about Popper's behavior, Popper remained Savino's supervisor. Drawing all inferences in Savino's favor, the evidence supports a reasonable jury finding that, at the very least, Popper had apparent authority to affect Savino's tangible employment benefits. Accordingly, C.P. Hall's motion for summary judgment on Savino's quid pro quo claim is denied.

### 2. Hostile Work Environment Harassment

### a. A Reasonable Jury Could Find that Popper Created a Hostile Work Environment

■ A hostile work environment claim will survive a motion for summary judgment

if the plaintiff introduces evidence that the harassment was "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Id.* at 567 (quoting *Henson v. City of Dundee,* 682 F.2d 897, 904 (11th Cir.1982)); *Doe v. R.R. Donnelley & Sons Co.,* 42 F.3d 439, 443 (7th Cir.1994). Several factors may be considered in determining whether the plaintiff's work environment is hostile, and thus actionable under Title VII, including "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Saxton v. American Tel. & Telegraph Co.,* 10 F.3d 526, 534 (7th Cir.1993) (quoting *Harris v. Forklift Sys. Inc.,* 510 U.S. 17, 23, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993)).

▬ In addition, "not all conduct that has sexual overtones can be characterized as the sort of sexual harassment that is forbidden by the statute." *Doe,* 42 F.3d at 443; *see also Koelsch v. Beltone Elec. Corp.,* 46 F.3d 705, 708 (7th Cir.1995) (finding that "[i]solated and innocuous incidents do not support a finding of sexual harassment.").[10] The inquiry focuses on the totality of the circumstances and no single factor is required or determinative. *Id.* Finally, these factors are evaluated from both a subjective and objective viewpoint. That is, the actual effect of the conduct on the plaintiff is considered along with the likely impact on a reasonable person in the plaintiff's position. *See id.; Doe,* 42 F.3d at 444; *Dey v. Colt Constr. & Dev. Co.,* 28 F.3d 1446, 1454–55 (7th Cir. 1994). From a subjective standpoint, "[i]f the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the

victim's employment, and there is not a Title VII violation." *Harris,* 510 U.S. at 21–22, 114 S.Ct. at 370–71.

▬ C.P. Hall contends that it did not allow a hostile work environment to exist and, as such, should be granted summary judgment on Savino's hostile work environment claim. Specifically, C.P. Hall maintains that Popper's conduct toward Savino in no way meets the "severe and pervasive" standard required to constitute a hostile environment because Savino complained of only a "few" incidents over a three month period, the comments were not made on a daily basis, the incidents did not interfere with Savino's ability to complete her daily work, and Savino delayed reporting the incidents. *See* Def.'s Mem. at 9–10. Viewing all the evidence and drawing all reasonable inferences in Savino's favor, we disagree.

Savino has undoubtedly alleged more than a few incidents spanning a few months. The fact that these comments or acts were not made on a daily basis (and this is disputed)— while relevant to the "pervasive" prong of the standard—is not dispositive of the question as a matter of law. *See Jansen v. Packaging Corp. of America,* 123 F.3d 490, 502 (Flaum, J., concurring) (generally a minimum of two instances of harassment is required for an actionable claim). As detailed above, Savino easily alleged at *least* 10 specific instances of Popper's inappropriate behavior.[11] These incidents, taken with Savino's more general allegations that Popper *frequently* stared at Savino and often followed her around—so much so that coworkers commented that Popper "must not let [you] out of his sight," *see* Pl.'s Dep. at 66— could support a reasonable jury's determination that such conduct was sufficiently pervasive.

---

**10.** The Seventh Circuit has provided some guidance regarding the level of hostility or pervasiveness required to establish a claim of hostile work environment. *See, e.g., Baskerville v. Culligan Int'l Co.,* 50 F.3d 428, 430 (7th Cir.1995) ("occasional vulgar banter, tinged with sexual innuendo of coarse or boorish workers" not actionable); *Saxton,* 10 F.3d at 535 (supervisor's inaccessibility, condescension, impatience and teasing are not harassment); *Weiss v. Coca–Cola Bottling Co.,* 990 F.2d 333, 337 (7th Cir.1993) (several incidents of unwanted touching, attempted kiss-

es, asking out on dates, calling plaintiff a "dumb blonde," and placing "I love you" signs in work area not harassment).

**11.** Such incidents included the coffee incident, the soap dispenser incident, the oral sex comments, the "nice ass" comment, the Mount Nipple incident, the Playboy incident, the home phone calls, the dinner invitation, restraining Savino in the office, the neck massage, and touching Savino's legs.

Likewise, a jury could reasonably find that Popper's conduct was sufficiently severe to affect the conditions of Savino's employment. Although some of Popper's remarks and conduct may be taken as sophomoric "attempts" at humor,[12] other conduct reasonably could be perceived as "crossing the line," such as the home telephone calls, his frequent staring and stalking (both on and off the job), and the repeated dinner and lunch invitations, culminating in Popper's act of blocking Savino's exit from their office while stating "we'll go out to dinner tonight," *see* Pl.'s Dep. at 87. These acts are not of the "mildly offensive" or "vulgar banter" type— instead, they focus ominously and specifically on a victim. A reasonable jury could find that Popper's "sophomoric" comments, compounded with his more threatening or serious misconduct, were sufficiently severe to constitute a hostile working environment, such that it deprived Savino—or a reasonable person in Savino's position—of a "right to work in an environment free from discriminatory intimidation, ridicule and insult," thus materially altering the conditions of her employment. *See Meritor*, 477 U.S. at 65, 106 S.Ct. at 2404.

Having established that a jury could reasonably find that Popper's conduct was sufficiently severe or pervasive to affect a reasonable person in Savino's position, we next turn to the subjective test—the effect of Popper's conduct on Savino. We believe that Savino has sufficiently shown that she perceived the environment to be abusive. For example, Savino testified that the general and specific instances of Popper's misconduct made her feel "uneasy," "angry," "repulsed," "uncomfortable," "distressed" and fearful. *See* Pl.'s Add'l Facts ¶¶ 15–17, 20–21. In fact, these instances had such an effect on Savino, she actively sought other positions within the company to get away from Popper. Pl.'s Add'l Facts ¶¶ 43–45. Despite the fact that Savino repeatedly told Popper that his comments or overtures were not appreciated or welcomed, his inappropriate behavior continued. *See generally Dockter v. Rudolf Wolff Futures, Inc.*, 913 F.2d 456, 461 (7th Cir.1990) (finding no actionable harassment where objectionable conduct stopped after

the plaintiff reprimanded the aggressor). Furthermore, C.P. Hall's contention that certain instances "could not have offended [Savino] if she never reported them until her deposition" is unpersuasive. We note that Savino claims most of these instances were reported during her initial meetings with Mullin and Green; it is for the jury to decide Savino's credibility. As such, Savino has sufficiently shown that she was actually affected by Popper's conduct.

Next, C.P. Hall's contention that Savino's claim must fail because she was able to complete her daily work misses the mark. While the question of whether the misconduct unreasonably interferes with an employee's work performance is *one* factor in the mix, it is not dispositive. As Judge Scalia explained in *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 25, 114 S.Ct. 367, 372, 126 L.Ed.2d 295 (1993) (Scalia, J., concurring), "the test is not whether the work has been impaired, but whether working conditions have been discriminatorily altered." The evidence leaves little doubt that Popper's behavior toward Savino was motivated by her gender. We cannot accept that Congress intended to penalize employees such as Savino for fulfilling her job responsibilities despite the harassing conduct she had to endure on numerous occasions. To the contrary, a reasonable jury could properly find that Popper's conduct altered the conditions of Savino's employment.

### b. A Reasonable Jury Could Find C.P. Hall Liable for Popper's Hostile Work Environment Harassment

Because we have determined that a reasonable jury could find that Popper's misconduct created a hostile work environment, we focus on the critical question of whether C.P. Hall is liable for the hostile work environment created by Popper.

The Seventh Circuit exhaustively discussed the scope of an employer's liability in sexual harassment cases in *Jansen*. Although the decision was divided into numerous separate opinions, the majority agreed

---

12. *See, e.g., Baskerville*, 50 F.3d at 431 (noting that supervisor's lewd comments and innuendoes reflected "a man whose sense of humor took final shape in adolescence.").

that "the standard for employer liability in cases of hostile-environment sexual harassment by a supervisory employee is negligence, not strict liability." *Jansen*, 123 F.3d at 495.[13] As such, an employer who is negligent "in the hiring, supervision, monitoring, or retention" of a plaintiff's supervisor is liable for the hostile work environment created by the supervisor's sexual harassment. *Id.* at 493. Employers are liable for hostile work environment harassment only "when they have been negligent either in discovering or remedying the harassment." *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1013 (7th Cir.1997); *see also Baskerville*, 50 F.3d at 432. However, the fact that an employer "may not have succeeded in stopping the harassment" does not render the employer negligent. *See Young v. Bayer*, 123 F.3d 672, 673 (7th Cir.1997) (noting that such "would make the test one of strict liability").

■ In determining whether an employer was negligent in hostile work environment actions, a court must determine whether an employer "has taken due care to prevent harassment and to respond to complaints of harassment." *Jansen*, 123 F.3d at 502 (Flaum, J., concurring). An "employer's legal duty is ... discharged if it takes reasonable steps to discover and rectify acts of sexual harassment of its employees." *Baskerville*, 50 F.3d at 432. Among the factors considered in determining whether an employer took reasonable steps to prevent or discover harassment are the publication and dissemination of sexual harassment policies and the grievance procedures in place. *See Jansen*, 123 F.3d at 502 & n. 11 (Flaum, J., concurring) (noting that "[a] negligence standard will encourage companies to publicize sexual harassment policies and provide effective grievance procedures"). Whether an employer's steps to rectify the situation were

reasonable depends upon "the gravity of the situation," *Baskerville*, 50 F.3d at 432, and are "measured against how much [the employer] knows or should have known," *Perry*, 126 F.3d at 1015.

The Seventh Circuit recently revisited the issue of employer liability in hostile work environment cases in *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010 (7th Cir.1997). In *Perry*, the plaintiff complained to upper-level management that her supervisor had sexually harassed her by making inappropriate comments "on a daily basis." *Id.* at 1012. The Court ultimately held that the district court properly directed a verdict in the defendant's favor because the plaintiff, who quit prior to making a complaint and failed to assist the company in its investigation, failed to establish that the employer had reason to know about the discriminatory harassment. *Id.* at 1014–15.[14] Moreover, the Court noted that the employer's actions to prevent and discover any harassment were reasonable in any event because it had "anti-harassment policies and employee meetings on the subject," and instructed employees to report any harassment. *Id.* at 1014. The Court similarly found the defendant's response to the plaintiff's complaint was reasonable. After receiving the plaintiff's complaint over the telephone, the employer offered the plaintiff a position at another location and agreed to meet with the plaintiff to further discuss the substance of her complaint. Even though the plaintiff declined both offers, the employer promptly interviewed the plaintiff's supervisor (the subject of plaintiff's complaint) and a potential witness. *Id.* As such, "nothing indicates that [the employer's] response was wanting" after the plaintiff complained. *Id.* at 1016 (Wood, J., concurring).

Nevertheless, granting summary judgment on the issue of employer liability is a tall

---

13. Given the divergence of opinions within the Seventh Circuit and in other circuits on the appropriate standards for employer liability, it is less than surprising that the Supreme Court recently granted certiorari in *Faragher v. City of Boca Raton*, 111 F.3d 1530 (11th Cir.1997) to resolve many of the issues raised here. We also note that a petition for certiorari was filed in *Jansen* and is currently pending.

14. Notably, the Court bypassed an inquiry as to whether a hostile environment in fact existed and focused solely on the issue of employer liability,

stating that "[s]ometimes we need not decide whether particular conduct or comments crossed the line and were actionable," because even if plaintiff established a hostile work environment, employer liability does not necessarily follow. *See Perry*, 126 F.3d at 1013. In the present case, however, we evaluate the existence of a hostile work environment because it was specifically raised by C.P. Hall in its motion for summary judgment. We cannot conclude that C.P. Hall was not negligent, and thus not liable, as a matter of law.

order.[15] While C.P. Hall contends that it cannot be held liable for any hostile work environment created by Popper because it posted its sexual harassment policy and responded promptly to Savino's complaints, we are not convinced that C.P. Hall did enough to preclude a jury finding of negligence. First, a jury could find that C.P. Hall's preventive measures were deficient. Second, while C.P. Hall did take some action in response to Savino's complaint, a reasonable jury could find some of C.P. Hall's subsequent responses lacking. We address each of these concerns in turn.

#### i. C.P. Hall's Preventive Measures

■ C.P. Hall distributed a written sexual harassment policy to managers and supervisors in 1993 with a directive that the managers and supervisors further distribute the policy to the employees in their departments and discuss the policy in group meetings. See Def.'s Facts ¶¶ 45, 49–50. The policy was also posted at all C.P. Hall facilities. Def.'s Facts ¶ 44. While this is better than having no policy at all, certain implementation measures may be found "lacking." A reasonable jury, for example, may have the following questions: Were any steps taken to ensure that the policy was, in fact, distributed to *all* employees, not just managers and supervisors, so that they knew which avenues to pursue for complaints about harassment? If not, was posting the policy on a bulletin board sufficient "dissemination" to such employees? Is relying on managers and supervisors to "get the word out" an adequate means of distribution when some of the worst offenders are managers and supervisors themselves? What steps were taken to ensure that new employees—who began working after the 1993 dissemination of the policy—would be made aware of it?

Here, the facts show that C.P. Hall distributed its sexual harassment policy to managers and supervisors in 1993. But neither Popper, as Savino's supervisor, nor the human resources department gave a copy of the policy to Savino when she began her employment with C.P. Hall. Furthermore, Savino never saw the policy posted on the bulletin board; she saw it for the first time when she complained to Mullin in July 1995—almost four full months after her start date. Although Savino eventually complained to Mullin, she may have complained earlier had she known that C.P. Hall had a sexual harassment policy in place, that certain behavior would not be tolerated by the company, and if she had known about the appropriate reporting channels. Knowledge of the policy and its provisions also may have allayed Savino's concerns of being perceived as a "trouble-maker" or "instigator." See Pl.'s Add'l Facts ¶ 12. As such, we cannot hold that C.P. Hall was not negligent as a matter of law in preventing sexual harassment from occurring.

#### ii. C.P. Hall's response to Savino's complaints

■ We next turn to C.P. Hall's response to Savino's 1995 and 1996 complaints to Mullin and Green. While we do not agree that C.P. Hall failed to take *any* action, see Pl.'s Resp.Br. at 7, we find that a reasonable jury could have concerns regarding the sufficiency of C.P. Hall's remedial actions. We acknowledge that a jury could find that C.P. Hall took prompt action upon notice of Savino's complaint. Mullin immediately notified the human resources department, which in turn sent someone the next day to meet with

---

**15.** It may be even more difficult when the alleged harasser is a supervisor. Judge Flaum's concurrence in *Jansen* imposes a heightened duty of care upon an employer when the complainant's harassment comes at the hands of a supervisor rather than a coworker. Under Judge Flaum's approach, courts should employ the heightened standard when analyzing both the mechanism in place for addressing employees' complaints of harassment (proactive) and the defendant's investigation of and response to the complaint (reactive). *Id.* at 502. Judges Cummings, Evans, Bauer, and Cudahy joined Judge Flaum's opinion, while Chief Judge Posner and Judges Coffey, Manion, and Kanne opposed it.

Judge Diane P. Wood issued an opinion, joined by Judges Easterbrook and Rovner, questioning the necessity of differentiating between quid pro quo harassment and a hostile work environment created by a supervisor. While Judge Flaum's heightened standard garnered a plurality in *Jansen*, the Seventh Circuit declined to apply it in *Perry*, 126 F.3d at 1014, but noted that it was irrelevant to the outcome of the case. *Id.* at 1014 n. 2 We similarly find that our ruling does not turn upon application of the heightened duty approach, as we find a question of fact concerning the adequacy C.P. Hall's proactive and reactive measures exists whether we apply a pure negligence or a heightened duty standard.

Savino to further discuss her allegations. Roach and Mullin notified Popper of the claim within two days of Savino's complaint, interviewed him, and then allegedly gave him a "strong verbal warning." *See* Def.'s Facts ¶ 108. But the jury may well decide that this verbal warning—as opposed to a written warning or any other action—was not a sufficient response, given the other circumstances.

While C.P. Hall promptly removed Savino from the hostile environment created by Popper, we are troubled by the fact that Popper continued to be her supervisor, giving her most of her assignments. He remained Savino's supervisor even when she was later given accounting responsibilities. Furthermore, Popper was supposed to send Savino's work assignments through inter-office mail. *See* Pl.'s Add'l Facts ¶¶ 52, 62; Pl.'s Dep. at 142–143. Although this established procedure would appear to alleviate the problem, it is questionable in two important aspects. First, it was not followed and there was no mechanism for enforcement. Savino testified that instead of following this procedure, Popper delivered her work assignments to her personally or left them on her desk—contrary to the established procedure, thus exposing Savino to more interaction with Popper. Second, by allowing Popper to remain as Savino's supervisor, and forcing him to accomplish his department's work through inter-office mail—no slight inconvenience— Popper was constantly reminded of Savino's complaint. As such, the very mechanism

designed to alleviate the situation may have fanned the flames of Popper's hostility. While an employer may not be liable even if the harassing conduct does not stop (*see Young,* 123 F.3d at 673), its remedial actions do not preclude a negligence finding if such actions *allow* the conduct to continue, much less exacerbate it.[16]

Other aspects of C.P. Hall's remedial action similarly appear to be lacking. While C.P. Hall's response in many ways appears to be "prompt" and of some substance in that it interviewed witnesses,[17] Savino still had job responsibilities under Popper, despite the fact that Savino specifically asked to be removed from Popper's department. *See* Pl.'s Add'l Facts ¶ 71. The defendant denied Savino's request for a "face to face" meeting with Popper, and only suspended Popper *after* Savino filed this lawsuit. Drawing all reasonable inferences in Savino's favor, we cannot conclude C.P. Hall's actions in response to Savino's allegations of harassment were sufficient to relieve C.P. Hall of liability, as a matter of law. Rather, we believe that whether the defendant was negligent is a question of material fact for the jury to decide.

## C. Savino Has Not Produced Sufficient Evidence to Sustain a Retaliation Claim

Although Savino's sexual harassment claim remains viable, her retaliation claim fails as a matter of law.[18] We agree with C.P. Hall that no evidence in the record supports Savi-

---

16. We find that the Seventh Circuit's decision in *Saxton v. American Tel. & Tel. Co.,* 10 F.3d 526 (7th Cir.1993) is readily distinguishable from the instant case. In *Saxton,* the court found the employer's remedial actions responsive, in part because the employer completely removed the harassing supervisor from the plaintiff's department, thus ensuring "that any fallout she was experiencing as a consequence of rejecting him ceased as well." *Saxton,* 10 F.3d at 535–36. Further, such removal "was a sufficient safeguard against any recurrence of the harassment." *Id.*

17. Savino claims that she told numerous coworkers as early as one-and-a-half months into her employment that Popper constantly stared at her and followed her around; repeatedly asked her to dinner, timed her breaks and discredited others. Pl.'s Facts ¶ 51. We are not convinced that any of these non-supervisory or non-managerial coworkers had a duty to report the harassment to

management or human resources, the proper persons with whom to register complaints per C.P. Hall's sexual harassment policy. As such, for purposes of this motion, we find that C.P. Hall had notice of Savino's complaint when she complained to Mullin, the plant manager, on July 26, 1995. *See, e.g., Young,* 123 F.3d at 674–75 (inquiry regarding when employer had notice of harassment begins with identifying "who has the duty under the employer's rules to channel complaints of sexual harassment to the employees of the company who are empowered to act upon such a complaint," as generally "no single employee is the corporation.").

18. Prior to this court's issuance of a written opinion, the plaintiff filed a motion to reconsider our order granting summary judgment on her retaliation claim—improperly raising for the first time additional claims. We previously denied the plaintiff's motion to reconsider without prejudice, and address only the arguments raised in

no's claim that retaliation was the reason for her unsuccessful bid for two accounting positions. We further find that any claim that C.P. Hall retaliated against Savino when it failed to give her a raise on her anniversary date also fails as a matter of law.

■ Title VII prohibits an employer from retaliating against an employee "because [the employee] has opposed any practice made an unlawful practice by [Title VII]." 42 U.S.C. § 2000e–3(a). In order to make a prima facie case of retaliation under Title VII, a plaintiff must show that: 1) she engaged in statutorily protected expression; 2) she suffered adverse action by her employer; and 3) there is a causal connection between the protected expression and the adverse action. *See Rennie v. Dalton*, 3 F.3d 1100, 1109 (7th Cir.1993). If the plaintiff demonstrates such a showing, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its action. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Bahl v. Royal Indem. Co.*, 115 F.3d 1283, 1290 (7th Cir.1997). To meet this burden, the defendant must produce evidence "which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action." *Saint Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509, 113 S.Ct. 2742, 2748, 125 L.Ed.2d 407 (1993); *see also Oates v. Discovery Zone*, 116 F.3d 1161, 1170 (7th Cir.1997). If the defendant provides such an explanation, the burden shifts back to the plaintiff to show that the defendant's justification is merely "pretext." *See McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825; *see also Jansen*, 123 F.3d at 493 (motion for summary judgment properly granted where plaintiff presented no evidence that defendant's "reasons were mere pretexts nor any other evidence from which retaliatory intent could be inferred"). Pretext may be shown by establishing one of the following: 1) the defendant employer's justification had no ba-

sis in fact; 2) the explanation was not the "real" reason; or 3) the reason stated was not sufficient to warrant the adverse employment action. *See Collier v. Budd Co.*, 66 F.3d 886, 892 (7th Cir.1995).

Moreover, to state a claim for retaliation, the adverse action taken against the employee must be material. An adverse action is material when a change in the "terms and conditions of employment" is "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir.1993). Such a materially adverse change could include "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, or other indices that might be unique to a particular situation." *Id.* This is not an exhaustive list, however, because "adverse actions can come in many shapes and sizes.... The law does not take a 'laundry list' approach to retaliation, because ... its forms are as varied as the human imagination will permit." *Knox v. Indiana*, 93 F.3d 1327, 1334 (7th Cir.1996). However, "not everything that makes an employee unhappy is an actionable adverse action." *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir.1996).

At the outset we note that there is no question regarding the first element of the prima facie case. Savino has clearly engaged in statutorily protected activity in complaining against Popper, first to C.P. Hall, and then to the E.E.O.C. *Damato v. Jack Phelan Chevrolet Geo, Inc.*, 927 F.Supp. 283, 288 (N.D.Ill.1996) (finding that even an informal complaint to a supervisor would constitute protected activity). The critical issues are whether Savino can otherwise establish a prima facie case of retaliation, and whether she can rebut C.P. Hall's proffered explanations for failing to promote her and denying her an "anniversary" raise. We address each possible claim of retaliation in turn.[19]

---

the original pleadings with respect to this motion. We note, however, that it is improper for the plaintiff to raise new factual issues on a motion to reconsider. *Moro v. Shell Oil Co.*, 91 F.3d 872, 876 (7th Cir.1996) (Federal Rule 59(e) does not allow parties to advance arguments in motions to reconsider that should have been raised prior to the district court's judgment).

19. Savino contends that Popper's acts of hiding Green's message regarding a possible job opportunity and withholding work orders from her are retaliatory actions. Since both of these actions occurred before Savino complained to Mullin on July 26, 1995, but after Savino refused Popper's dinner request, we believe these actions fall within Savino's *quid pro quo* claim and, as such, address them there.

## 1. The Regional Accountant Position at the 7300 Facility

Savino claims that she suffered an adverse job consequence when C.P. Hall failed to promote her into the position of Regional Accountant. As Savino did not interview for this position, nor has she shown that she was more qualified than Morrow, we find that the only tenable "adverse job consequence" suffered by Savino is that she was not notified of the position and given the opportunity to interview for it. Assuming that this failure to notify or interview is, in fact, an adverse consequence, Savino's retaliation claim fails because: 1) she has not shown that there is any causal connection between her complaint and the action; 2) even if she did, C.P. Hall has provided ample evidence that it had a legitimate, non-discriminatory reason for not notifying or interviewing Savino; and 3) Savino has failed to provide any evidence that C.P. Hall's reasons were merely pretext.

First, with regard to the causal connection element, Savino must produce some evidence that C.P. Hall withheld this position from Savino because of her decision to report Popper's harassment. She has not. The only possible "link" between the complaint and the position is Roach, who knew of both. However, the evidence shows that Roach took preventive steps in response to Savino's allegations, not that he punished Savino for them. For example, Roach removed Savino from Popper's office, if not entirely from his department, to office space considerably more amenable. Nor has she presented any evidence that Roach's conduct in posting the position or interviewing for it had anything to do with Savino's harassment report. Savino has simply presented no evidence—direct or circumstantial—from which to infer that Roach, on C.P. Hall's behalf, withheld the opportunity to interview for this position as a result of her complaint.

Even assuming that Savino can establish such a link, we believe that C.P. Hall has produced sufficient evidence to show that it had legitimate non-discriminatory reasons for not interviewing Savino and promoting Morrow instead. First, the position was located at another facility and was filled—not by Roach, Popper, Mullin, Green, or any other manager or supervisor involved with Savino's complaint—but by Zielinski, who had no knowledge of Savino or her complaint when he moved Morrow into the accountant position. *See Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1458 (7th Cir.1994) (finding that, in general, a plaintiff cannot establish a causal link in the absence of knowledge). Also, Zielinski moved Morrow into the position solely to satisfy) budgetary constraints—he was notified that he had to reduce the headcount in one of his departments and when a position became available in another of his departments, he moved Morrow to that position. *Id.* ¶¶ 4–5; Def.'s Facts ¶ 200.

We disagree with Savino's assertion that this position was somehow a "gift" to Morrow, who was unqualified for the position. As of September 1995, Morrow had already received her degree in Business Administration, majoring in finance; Savino, on the other hand, was a full year away from completing her education in accounting. Furthermore, Morrow had two years of experience as a customer service representative and purchasing assistant at C.P. Hall. Savino, on the other hand, had just started with the company five months prior and worked part-time (and initially chose to do so). We cannot say that C.P. Hall had no legitimate reason to promote someone with a relevant educational background and experience who had been with the company longer than Savino. We further note that, although Savino asserts that Morrow's degree in Business Administration was irrelevant to her position, *see* Pl.'s Add'l Facts ¶ 82, Morrow's boss thought otherwise. Morrow's salary review form—signed by Zielinski—clearly indicates that the "Regional Accountant position will allow [Morrow] to utilize her educational background." Pl.'s App.Ex.F. C.P. Hall has thus satisfied its burden of producing a legitimate, non-discriminatory reason for not promoting Savino into this position. Savino, on the other hand, has not even attempted in her response brief to establish that C.P. Hall's actions were merely pretext.

## 2. The Plant Accountant Position at the 5851 Facility

Savino similarly claims that C.P. Hall's failure to notify Savino of the Plant Accountant position and interview her for it consti-

tuted an adverse job action. This claim also fails because, even assuming its truth, Savino has simply produced no evidence of a causal connection between her complaint and C.P. Hall's failure to interview Savino. Furthermore, C.P. Hall has produced a legitimate, non-discriminatory reason for its actions that Savino has failed to properly rebut.

Savino specifically claims C.P. Hall raised the requirements for the position solely in an attempt to disqualify her for the position, *see* Pl.'s Dep. At 196, and she was retaliated against because she "was not given the opportunity to interview for the 5851 position," *see* Pl.'s Add'l Facts ¶ 87. Contrary to Savino's assertions, the evidence shows that C.P. Hall raised the requirements for the position before Savino expressed any interest in applying, and when C.P. Hall offered to interview Savino for the position, she declined to do so.

We first address Savino's claim that C.P. Hall raised the requirements for the Plant Accountant position solely to disqualify her for the position. In March 1996—one month before Savino again complained about Popper and prior to the time she expressed interest in the position—Martinek increased the minimum requirements for the job. Whereas the position previously required a four-year degree, *or* one to two years of experience, *or* an equivalent amount of experience and education—requirements that Savino could arguably satisfy—the new requirements called for a four-year degree in accounting *and* two years of experience in a manufacturing setting *and* preferably some supervisory experience. *See* Def.'s Facts ¶¶ 210–211. Thus Savino no longer met the minimum requirements because, at the very least, she did not yet have her accounting degree. Martinek, however, justified her decision to increase the requirements. For instance, the person who ultimately filled the position would have to work independently (since the position was at the Bedford Park location, and Martinek worked out of corporate headquarters in downtown Chicago), and would "need to have enough experience to make sound accounting decisions without the benefit of immediate management feedback." *See* Def.'s App.Ex. K at KS 235.

Also relevant to this discussion is the fact that Martinek did not know of Savino's com-

plaint until May 1996—two months after she changed the requirements for the position. *See Dey,* 28 F.3d at 1458 (finding no causal link in the absence of knowledge). Nor is there evidence of collusion or a conspiracy on the part of management to prevent Savino from qualifying for or receiving the position. As such, Savino cannot establish a causal connection between her complaint and upgrading the job requirements and, even if she could, C.P. Hall has presented a noninsidious reason for its decision to upgrade the requirements for the position.

Next, even if Savino was qualified for the position, she declined the interview, and cannot now claim retaliation because she did not get the job. Although Martinek had reservations regarding Savino's qualifications, she agreed to interview Savino. Since Savino had some experience and would soon receive her accounting degree, C.P. Hall was willing to give Savino the "benefit of the doubt" by granting her an interview. *See* Def.'s App. Ex. K Savino admits that Green told her on more than one occasion that Martinek would interview her for the position. Pl.'s Dep. At 132, 192. This evidence is contrary to Savino's contention that "corporate" had discouraged Martinek from interviewing Savino. *See* Pl.'s Dep. at 192. When asked, Savino chose not to interview for the position, claiming that she did not believe that "the company had any long-term plans" for her, and that she did not want the interview "if you're just trying to pacify me." *See* Pl.'s Dep. at 203–04. By declining the interview, Savino cannot now claim that C.P. Hall retaliated against her. *See Perry v. Harris Chernin, Inc.,* 126 F.3d 1010, 1014 (7th Cir.1997).

Savino claims, perhaps in an attempt to establish pretext, that C.P. Hall interviewed someone who "also didn't have the qualifications." Pl.'s Dep. at 192, 202. Savino has failed to point to any evidence indicating who this person was, what qualifications he or she possessed, or that such a person was, in fact, interviewed. The inquiry is moot, however, because Savino herself also could have interviewed for the position, but chose not to. Furthermore, Savino's insinuations that the job did not actually require "two years of cost accounting" are irrelevant. Savino admitted in her deposition that the person actually hired for the position, Ed Wier, who had

ten years of experience, was being well utilized by C.P. Hall. C.P. Hall's reasons for raising the requirements were proven justified. She therefore has no evidence of pretext to overcome C.P. Hall's legitimate non-discriminatory reasons for its actions.

### 3. The Lack of an "Anniversary Raise"

■ Finally, Savino's claim that C.P. Hall's failure to give her a raise on April 1, 1996, her "anniversary date" constituted retaliation, fails as a matter of law. We merely note that even if Savino has produced sufficient evidence to meet the second and third elements of a prima facie case, specifically that she suffered an adverse job action by being denied a raise on her start date as a result of her complaint, C.P. Hall has satisfied its burden of producing sufficient evidence of a legitimate, non-discriminatory reason for the action. Specifically, C.P. Hall produced evidence showing that raises are given at the beginning of the fiscal year (in October) and not on anniversary dates, that employees generally must be employed for a full year prior to receiving raises, that as an exception to this rule Savino received benefits at a company cost of $3.46 per hour in October 1995 (six months after she started), and that benefits are sometimes given to part-time employees in lieu of raises. Finally, C.P. Hall provides an example of this specific conduct in the past, where a part-time employee was not given a raise in October (when she had been employed less than a year), was given benefits in lieu of a raise the following October, and finally received her first "raise" the following year—25 months after she began. *See* Def.'s Facts ¶ 243. Thus, C.P. Hall has provided a legitimate reason for not giving Savino a raise on her anniversary date and Savino has not alleged any contrary evidence to establish pretext. Nor can we conclude that a jury could reasonably reach such a finding.

Savino has not produced sufficient evidence to establish a prima facie case of retaliation, and even assuming that she had, she failed to produce evidence that C.P. Hall's nondiscriminatory reasons were merely pretext. In the absence of such evidence, we conclude that C.P. Hall is entitled to judgment as a matter of law on Savino's retaliation claim.

### CONCLUSION

We find that Ms. Savino has presented sufficient evidence in support of her claims of hostile work environment and quid pro quo harassment to survive C.P. Hall's motion for summary judgment. Drawing all inferences in Ms. Savino's favor, the trier of fact could reasonably conclude that Mr. Popper created an environment permeated with sexual innuendo and inappropriate behavior. The evidence supports Ms. Savino's contention that after she declined Mr. Popper's dinner invitation, he used his supervisory authority to harass and discredit her-perhaps in an effort to force Ms. Savino to reconsider her rejection of him. We cannot agree, however, that Ms. Savino has demonstrated that C.P. Hall retaliated against her for complaining about Mr. Popper by withholding a raise and certain promotions from her. To the contrary, C.P. Hall has presented nondiscriminatory reasons for these actions. For the foregoing reasons, C.P. Hall's motion for summary judgment is granted in part and denied in part. Specifically, C.P. Hall's motion is denied as to Savino's hostile environment and *quad pro quo* counts, and granted with respect to Savino's retaliation count.

A status hearing will be held on January 14, 1998 at 9:00 a.m. to discuss all issues which will ensure a fair and efficient trial.