Emily BRYSON, Plaintiff–Appellant,

v.

CHICAGO STATE UNIVERSITY, Dr. Chernoh Sesay, as Provost and Vice–President of Academic Affairs, and Board of Governors of State Colleges and Universities, et al., Defendants–Appellees.

No. 95–3435.

United States Court of Appeals,
Seventh Circuit.

Argued April 15, 1996.

Decided Sept. 18, 1996.

James P. Nally, Cheryl Alesia, Fioretti & Desjardins, Chicago, IL, for Emily Bryson.

Edward B. Miller, Patricia J. Hill, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, David L. Stanczak (argued), Dunn, Ulbrich, Hundman, Stanczak & Ogar, Bloomington, IL, for Chicago State University, Board of Governors of State Colleges and Universities.

Karen J. Dimond (argued), Office of the Attorney General, Civil Appeals Division, Chicago, IL, for Avan Billimoria.

Before COFFEY, RIPPLE and DIANE P. WOOD, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

Emily Bryson is a tenured full professor at Chicago State University. She claimed, in a lawsuit brought under Title VII, 42 U.S.C. §§ 2000e–2(a), *et seq.*, that she had been the victim of quid pro quo sexual harassment inflicted by then-Provost Chernoh Sesay. She also raised claims of hostile environment sexual harassment, intentional infliction of emotional distress, and sexual assault and battery, but she does not pursue them on appeal. The district court granted summary judgment to Chicago State University, Sesay, and the other defendants named in the suit, on the ground that Bryson failed adequately to demonstrate that she had lost any tangible employment benefit as a result of her rejections of Sesay. Because we conclude that the record reveals genuine issues of fact on this point, we reverse and remand for further proceedings.

**I**

In an appeal from the denial of summary judgment, our review is *de novo,* and we take the facts in the light most favorable to the party opposing the motion. See, *e.g., Vitug v. Multistate Tax Comm'n,* 88 F.3d 506, 511 (7th Cir.1996); *Fuka v. Thomson Consumer Electronics,* 82 F.3d 1397, 1402 (7th Cir.1996); *Mlsna v. Unitel Communications, Inc.,* 41 F.3d 1124, 1127 (7th Cir.1994). Our recital of the background proceeds from that perspective.

Bryson joined the Chicago State faculty in January 1980, to work as a Bibliographic Instruction Librarian in the Library and Learning Resources Center. She was awarded tenure in 1983, and she attained full professor rank in 1990. From November 1989 to June 1990, Bryson was assigned the "in-house title" of "Special Assistant to the Dean" of Library and Learning Resources (LLR). In that capacity, she performed various administrative duties for the Acting Dean of LLR, Joshu Patel. In-house titles are used by Chicago State to designate additional responsibilities that faculty members undertake. They are not administrative titles, in the sense that the titles "assistant professor," "dean," or "provost" are, but they are important nonetheless. Faculty members enjoying an in-house title have that title reflected in the University Directory, and it is commonly used in addressing the individual in written correspondence. Furthermore, in-house titles are important for professional advancement, according to the testimony of several witnesses for Bryson, including Dr. Sherri Coe–Perkins, Dr. Patricia Atherton, and Thomas Vaughn.

Bryson continued to hold her title as Special Assistant to the Dean during the academic year 1990–91, when she performed those tasks for Acting Dean Annie Moore. At that time, she had significant administrative responsibilities, including managing and evaluating 65 student workers, responsibility for two library budgets, and generating and coordinating statistical information. In addition, Bryson served on both ad hoc and standing committees at the University. She was a member of the prestigious Budget Committee, which is an advisory committee

that reviews the budget and makes recommendations for the entire university. She was also on the Assessment Committee and the Retention Committee, two assignments made by appointment by the President or the Provost. In addition, she was on the Strategic Planning Committee, the Council of Faculties, the Executive Advisory Council to the Dean of the Library, and the Library Faculty Personnel Committee. Thomas Vaughn and Coe–Perkins both testified in depositions that service on committees allows a faculty member to gain credentials and qualifications and directly affects career advancement. Bryson herself also testified that even after a faculty member earns full tenure and promotion, a professor is still evaluated in the areas of research, creativity, and service; committee assignments form a critical part of the latter consideration.

The Board of Governors of State Colleges and Universities has an Administrative Fellowship Program, which is designed for faculty members who have the potential for leadership in administration. Participants are selected carefully from among those who have demonstrated significant administrative skills, and only one person per year from each constituent institution in the system is chosen as a Fellow. Bryson was the lucky person from Chicago State for the academic year 1991–92. She spent her fellowship at Eastern Illinois University, under the mentorship of the President of that university, Dr. Stanley Rives. At the end of that year, she returned to Chicago State. It was upon her return that her problems with Dr. Sesay, the Provost, reached the point of tangible changes in her employment position. This happened, she alleged, because she refused his repeated sexual overtures to her, which we now recount.

Chernoh Sesay was appointed Provost and Vice–President of Academic Affairs at Chicago State in July 1990. The Provost has full control and responsibility over faculty affairs at the university; he reports directly to the President. Sesay knew Bryson and supported her in her successful bid for an Administrative Fellowship. In January 1991 (after her selection but before she began her Fellowship), he began to make sexually suggestive and derogatory comments to her and to attempt to engage in improper physical contact with her. For example, in December 1990 at the President's Christmas party, Sesay approached Bryson, caressed her shoulders, pushed his body against hers, and whispered "when are you going to come over and start cooking for me?" Bryson jerked away and retorted, "I don't cook for anybody." In February 1991, while both Sesay and Bryson were visiting Governor's State (another campus in the system), Sesay asked Bryson to get into his car and go back to his hotel with him, so that they could "relax." Bryson refused. On numerous other occasions, he also suggested that they "relax" together, but she consistently rejected him. Several times in his office, he tried to kiss her. Once, in May 1991, he asked her into his office to discuss a library-related matter, but when she stood up to leave, he ran his hand up her dress and fondled her behind.

Sesay's inappropriate behavior continued during Bryson's fellowship at Eastern Illinois University. At a President's function in October 1991, he approached Bryson and asked, "Why aren't you going to let me up into your room? Let's go relax. I have something big to show you." Her rejections continued, however, and when in May 1992 he again asked her to come to his room to "relax" and she again refused, he warned her, "You had better do what I say or you're going to be sorry."

In June 1992, Bryson met with Chicago State President Dolores E. Cross to discuss her return. She said that she intended to return to her old position of Special Assistant to the Dean. Cross then called Sesay into the meeting. Sesay told her that the administrative title of "Special Assistant to the Dean" had never existed and that she had never performed those duties. Bryson interpreted this to mean that if she did not give in to his advances, she would have to work her way back up again. Sesay also told Bryson that all her tasks of special assistance to the dean had been reassigned to other people, and that she would be returned to bibliographic instruction work, her entry level position in 1980. Guy Craft, the Dean of LLR, told Bryson the next day that he had been in-

structed by his supervisors to "put [her] back as bibliographic instruction librarian."

Upon her return to Chicago State, although her work assignment "units" reflected the same number devoted to special assistance tasks as before, both her job description and her actual duties were diminished. By January 1993, all her special assistance responsibilities were deleted from her assignment. She filed a grievance with her union, which had the effect of permitting her to continue performing the disputed administrative tasks pending the outcome of the proceeding. In the end, she retained her duties as Special Assistant to the Dean, but she lost her in-house title. She also found herself frozen out of the university's administrative committees, even though appointments were made on an annual basis to most of them. She was denied reappointment to the Budget Committee, the Assessment Committee, and the Retention Committee, in spite of her expressed desire to continue serving. Her written request to serve on several other committees also fell on deaf ears.

In Bryson's view, Sesay had made good on his threats. She filed a charge with the EEOC on August 11, 1992, alleging that she was the victim of sexual harassment by Sesay. She argued that she was denied the employment benefits of membership on various administrative committees and the title of Special Assistant to the Dean as a direct result of her rebuffing Sesay's unwanted sexual advances. She received her right to sue letter on August 18, 1993, and filed a complaint with the district court on November 18, 1993, alleging both quid pro quo and hostile work environment sexual harassment. On July 15, 1994, the district court dismissed the defendants in their individual capacities and dismissed the hostile environment count and supplementary state claims for intentional infliction of emotional distress and sexual assault and battery. The court granted summary judgment to all defendants on the remaining quid pro quo claim on September 13, 1995.

## II

Even before the Supreme Court recognized the validity of the hostile work environment theory of sexual harassment in *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), it had been plain that Title VII's protection against sex discrimination reached harassment that was directly linked to the grant or denial of an economic quid pro quo. See, *e.g., Horn v. Duke Homes,* 755 F.2d 599, 603 (7th Cir.1985); *Simmons v. Lyons,* 746 F.2d 265, 270 (5th Cir.1984); *Katz v. Dole,* 709 F.2d 251, 256 n. 6 (4th Cir.1983); *Craig v. Y & Y Snacks, Inc.,* 721 F.2d 77, 80 (3d Cir. 1983). *Cf. Meritor Savings Bank,* 477 U.S. at 65, 106 S.Ct. at 2404. See generally Catherine MacKinnon, *Sexual Harassment of Working Women: A Case of Sex Discrimination* (1979). Quid pro quo harassment occurs in situations where submission to sexual demands is made a condition of tangible employment benefits. *Dockter v. Rudolf Wolff Futures, Inc.,* 913 F.2d 456, 461 (7th Cir. 1990). The EEOC Guidelines on Sexual Harassment, 29 C.F.R. § 1604.11(a), describe it as follows: "Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment" [or] "submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual."

In order to prove such a claim, many courts of appeals use a five-part test, asking whether the plaintiff has shown (1) that she or he is a member of a protected group, (2) the sexual advances were unwelcome, (3) the harassment was sexually motivated, (4) the employee's reaction to the supervisor's advances affected a tangible aspect of her employment, and (5) respondeat superior has been established. See, *e.g., Chamberlin v. 101 Realty, Inc.,* 915 F.2d 777, 783 (1st Cir. 1990); *Spencer v. General Electric Co.,* 894 F.2d 651, 658 (4th Cir.1990); *Highlander v. K.F.C. National Management Co.,* 805 F.2d 644, 649 (6th Cir.1986); *Jones v. Flagship International,* 793 F.2d 714, 721–22 (5th Cir. 1986); *Henson v. City of Dundee,* 682 F.2d 897, 903–05 (11th Cir.1982). Element (1) is

plain enough, and a common part of many kinds of discrimination claims. Element (2) focuses on the unwelcome nature of the sexual advances from the point of view of the recipient, while element (3) asks whether the harasser was looking for sexual favors or something else. Element (4) asks what the "quo" part of the quid pro quo was: what tangible aspect of employment was affected? Finally, element (5) recognizes that there is a need to link the employer to the actions of the harasser. We have no occasion here to decide whether these five elements perfectly capture today's law of quid pro quo harassment, or if it would be better to consolidate some or add others. For present purposes, they provide a useful framework for our discussion, which turns on only one element that we agree is critical.

▮ That element is number 4: what was the "tangible employment benefit" that was denied to Bryson, and was the denial a result of her refusal to submit to Sesay's demands? The question whether an employee has suffered a materially adverse employment action will normally depend on the facts of each situation. As this court noted recently in *Smart v. Ball State University,* 89 F.3d 437, 441 (7th Cir.1996), a wide variety of actions, some blatant and some subtle, can qualify. See also *McDonnell v. Cisneros,* 84 F.3d 256, 258–60 (7th Cir.1996); *Collins v. State of Illinois,* 830 F.2d 692, 703 (7th Cir.1987). In *Collins,* the court found an adverse employment action when the employer transferred a library employee to a new department where the supervisors were unsure of her new duties, she was largely relegated to reference rather than consulting work, and she had lost her office and telephone. See also *McCabe v. Sharrett,* 12 F.3d 1558, 1564 (11th Cir.1994) (employee suffered adverse job action where she had fewer responsibilities, was made to perform more menial tasks, and had lesser opportunity for salary increases in her new position).

▮ Bryson relies on the loss of two types of tangible employment benefits to meet this flexible test: first, she claims that her loss of the title Special Assistant to the Dean was a tangible adverse action, and second, she claims that her banishment from university committee work was such an action. Chicago State responds that the title had no independent meaning, and that committee work was nothing she could expect to do in any event. It stresses that she succeeded in retaining her tasks. The district court found that committee work was not essential to a tenured academic, and it expressed skepticism that anyone would really want to serve on committees in any event. It was similarly unimpressed with the loss of the title, which it found had only speculative value. The case would have been different, the court suggested, if Bryson had applied for tangible promotions such as a deanship and been unsuccessful.

With respect, we believe that the district court failed to recognize that Bryson raised disputed issues of fact on the issue of loss of tangible employment benefit. Bryson came forward with evidence that her title conferred prestige and was important to further professional advancement. She came forward with similar evidence regarding her committee work. The title, for example, would communicate to others both within the State Colleges and Universities system and outside it what kind of responsibilities had been entrusted to her. Committee work, especially on important committees like Budget and Retention, is often a prelude to an administrative career. Bryson herself, it is undisputed, had been on a promising job track for such a career, since she won the coveted position of Board Administrative Fellow for 1991–92. A sudden loss of all committee responsibilities and the stripping of a title one formerly held (when similar titles continued to be used throughout the university), if proven at trial, would be a loss of tangible employment benefits just as serious as moving an office to an undesirable location, relocating someone's personal files, or isolating the employee from others—all actions courts have held to qualify under Title VII in other cases. See *Collins,* 830 F.2d at 703.

Universities have few "carrots" to dangle in front of tenured faculty members who reach full professorhood. The subtle indicia of job status and reward thus may, in a particular institution, take on an importance

that may be far greater in context than would appear on the outside—indicia like honorary or in-house titles (that may have no budgetary effect, unlike their administrative counterparts) and committee assignments. The trier of fact must resolve the factual dispute over the reward structure that prevailed at Chicago State and how it related to the particular actions taken in Bryson's case. As the district court implicitly recognized, committee assignments and titles may play a part in preparing for an administrative academic career. The court erred in assuming that nothing adverse had happened to Bryson because she had not yet applied for a deanship. Depriving someone of the building blocks for such a promotion, if that is what a trier of fact thinks Chicago State did, is just as serious as depriving her of the job itself.

Chicago State also claims that Bryson did not offer sufficient evidence of causation. Here again, the record shows genuine issues of fact. Bryson pointed both to direct evidence of causation and circumstantial evidence. The direct evidence was Sesay's remark to her in May 1992 that she "had better do what I say or [she'll] be sorry." The circumstantial evidence began building immediately thereafter. In the June 1992 meeting, Sesay made a statement that a trier of fact could interpret as a veiled threat, when he told her the administrative title of "Special Assistant to the Dean" had never existed and that she had never performed those duties. The title had obviously existed, whether it was an "in-house" title or something more formal, and she had just as plainly performed the duties. The contrast between her position at Chicago State prior to her fellowship and her position upon her return might also strike a trier of fact as telling. As Provost, Sesay was in a position to effect all these changes. This was all Bryson needed to defeat Chicago State's motion for summary judgment on the quid pro quo harassment charge.

In closing, we note that Sesay himself is a separate party to this appeal. The district court correctly dismissed him in his individual capacity early in the proceedings. See *Williams v. Banning,* 72 F.3d 552, 555 (7th Cir.1995). Thus, the only action remaining against Sesay is in his official capacity. Such an action is, however, identical to the action against Chicago State itself. We were informed at oral argument that Sesay is no longer Provost at Chicago State, which underscores the inappropriateness of continuing an "official capacity" harassment suit against him. Surely this is not an instance in which we would substitute his successor, although that is the usual step that is taken in official capacity actions. We therefore conclude that the suit against Sesay in his official capacity should have been dismissed because the proper defendant for that purpose was Chicago State itself. As this amounts to an alternative ground for affirming the district court's grant of summary judgment for Sesay, there is no need to remand for further proceedings on this part of the case.

The decision of the district court granting summary judgment for Chicago State University is REVERSED and the case is remanded for further proceedings consistent with this opinion. The district court's summary judgment dismissing the claims against Dr. Chernoh Sesay is AFFIRMED.