**Ashieka E. KING Plaintiff,**

v.

**THE FINISH LINE, INC., Defendant.**

**No. 96 C 1367.**

United States District Court,
N.D. Illinois,
Eastern Division.

March 5, 1998.

---

David Allan Beck, Ronald A. Orner, Orner & Wasserman, Ltd., Chicago, IL, for Plaintiff.

Martha Ann Pagliari, Marc F. Benjoya, Cassiday, Schade & Gloor, Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

LEVIN, United States Magistrate Judge.

This action is for alleged sexual harassment under Title VII of the Civil Rights Act of 1964. Pending is Defendant's summary judgment motion. For the reasons set forth below, this court grants the motion as to the hostile work environment claim and denies the motion as to the *quid pro quo* harassment claim.

### FACTUAL BACKGROUND

Plaintiff Ashieka King ("King") began working for Defendant The Finish Line, Inc. ("The Finish Line") as a part-time salesperson in April 1994 at its retail store located at 701 West Cermack in North Riverside, Illinois. (Def.12(m) ¶ 1; Pl. 12(n) ¶ 1.) King alleges that the North Riverside store manager, Bryant Bobo ("Bobo"), sexually harassed her.

King's sexual harassment allegations revolve most prominently around an incident which King alleges occurred shortly after beginning work with The Finish Line. King states that Bobo asked King if she wanted to go downstairs with him. (Pl.12(n) Add. Facts ¶ 5.) While the two were in the store's downstairs area, Bobo tried to kiss King while holding her hands by her side. (*Id.*) King told Bobo to stop, and he did. (*Id.* ¶ 5; Def. 12(n) Resp. ¶ 2.) Then, however, King alleges that Bobo unzipped his pants, took his penis out and asked her to touch it. (*Id.*) King told Bobo to let her out of the basement, and Bobo did so after allegedly telling King not to tell anybody in the store about the incident. (Pl.12(n) Add. Facts ¶ 5.)

King alleges that Bobo subsequently made additional sexual comments to her. King states that, on one occasion, Bobo approached King in the hallway and asked her whether her boyfriend was "fucking [her] right." (Pl.12(n) Add. Facts ¶ 6.) During King's first job performance review, King states that Bobo asked whether she "looked at" another manager in the store or "looked at" Bobo, and whether she thought Bobo looked nice. (*Id.* ¶ 7.) In addition, King states that Bobo continually stared at her. (*Id.* ¶ 5.)

In mid or late July 1994, Bobo asked King to go to his office to talk with her. (Pl.12(n) Add. Facts ¶ 9.) At this time, Bobo told King that she had an "attitude problem" and that she needed to shape up how she was acting. (*Id.*) Before King left, Bobo kissed King on her neck and told her to "get with the program." (*Id.*) King remained silent and just left Bobo's office. (*Id.*)

Shortly after the above incident, King's hours were decreased from typically twenty hours per week to about ten hours per week

or less. (Pl.12(n) Add. Facts ¶ 10.)[1] King maintains that her hours decreased because she did not acquiesce to Bobo's sexual advances. The Finish Line asserts that King's hours decreased because of King's substandard performance and attitude and the normal flexibility of part-time staff schedules.

King worked for about two more weeks after her hours were decreased and then resigned from The Finish Line on August 10, 1994. (Def.12(m) ¶ 1; Pl. 12(n) ¶ 1.) King states that her humiliation, embarrassment and hurt feelings forced her to quit. (Pl.12(n) Add. Facts ¶ 13.) On the other hand, King also stated that when she began working for The Finish Fine, she intended to go to college in the fall of 1994. (Def.12(m) ¶ 2; Pl. 12(n) ¶ 2.)[2]

King never complained of any alleged incidents of sexual harassment at The Finish Line when they occurred or at any time before she left The Finish Line in August 1994. (Def.12(m) ¶ 5; Pl. 12(n) ¶ 1.) The Finish Line had a sexual harassment policy which informed employees how and to whom to complain of alleged harassment. (Def.12(m) ¶ 6; Pl. 12(n) ¶ 1.) Among other things, the district manager of The Finish Line, Mark Fogo, visited the store on a weekly basis and was available to hear any problems of store personnel. (*Id.*)

On March 8, 1996, Plaintiff filed this suit against The Finish Line for sexual discrimination pursuant to 42 U.S.C. § 2000e–2(a)(1).

## *ANALYSIS*

### I. SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has produced evidence to show that it is entitled to summary judgment, the party seeking to avoid such judgment must affirmatively demonstrate that a genuine issue of material fact remains for trial. *LINC Fin. Corp. v. Onwuteaka*, 129 F.3d 917, 920 (7th Cir.1997).

In deciding a motion for summary judgment, a court must construe the evidence in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Nevertheless, the nonmovant may not rest upon mere allegations but "must set forth specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). *See also LINC*, 129 F.3d at 920. A genuine issue of material fact is not shown by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson*, 477 U.S. at 252.

### II. *SEXUAL HARASSMENT*

Title VII prohibits "discriminat[ion] ... against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex[.]" 42 U.S.C. § 2000e–2(a)(1). There are two types of sexual harassment: (1) *quid pro quo* and (2) hostile work environment. Plaintiff argues that both types of sexual harassment have occurred here.

### A. *QUID PRO QUO HARASSMENT*

■ *Quid pro quo* harassment occurs in situations "where submission to a supervisor's sexual demands is made a condition of

---

1. King also alleges that Bobo became more hostile towards her. (Pl. Resp. at 3.) For example, King alleges that, on one occasion, Bobo threw some shoes that King was cleaning on the floor in front of customers. (Pl.12(n) Add. Facts ¶ 11.)

2. And, in fact, Northern Illinois University accepted King during the summer of 1994 for its school session which began in the middle of August. (Def.12(m) ¶ 2; Pl. 12(n) ¶ 1.)

tangible employment benefits." *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1013 (7th Cir.1997). *See also Bryson v. Chicago State University*, 96 F.3d 912, 915 (7th Cir. 1996). The Seventh Circuit has quoted the E.E.O.C.'s Guidelines on Sexual Harassment, 29 C.F.R. § 1604.11(a), to describe *quid pro quo* harassment as:

"Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when 1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment" ... [or] "submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual."

*Bryson*, 96 F.3d at 915. *See also Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (noting that E.E.O.C.'s Guidelines on Sexual Harassment "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance"). Here, King essentially alleges that her "rejection" of unwelcome sexual conduct by Bobo was the "basis for" adverse employment action against her.

The Seventh Circuit has stated that a multiple factor test employed by some circuits provides a "useful framework" for undertaking a *quid pro quo* analysis. *Bryson*, 96 F.3d at 915. Under this test, the plaintiff must show that: (1) she or he is a member of a protected group, (2) the sexual advances were unwelcome, (3) the harassment was sexually motivated, (4) the employee's reaction to the supervisor's advances affected a tangible aspect of her employment, and (5) respondeat superior has been established. *Id.*

■ Here, there is no dispute that King satisfies the first three factors. Factor five, the respondeat superior element, is automatically satisfied here as the Seventh Circuit now holds an employer is subject to strict liability where "submission to a supervisor's sexual demands is made a condition of tangible employment benefits." *Perry*, 126 F.3d at 1013. *See also Jansen v. Packaging Corp. of Am.*, 123 F.3d 490, 494–95 (7th Cir.1997) (per curiam). Therefore, the fourth factor is the critical element in this summary judgment motion.

To satisfy the fourth factor, King must demonstrate that: (1) a tangible aspect of employment benefit was adversely affected, and (2) that this effect was a result of her refusal to submit to Bobo's demands. *See Bryson*, 96 F.3d at 916.[3] The court will address the two parts in turn.

■ First, King must demonstrate an adverse employment action. "[W]hether an employee has suffered a materially adverse employment action will normally depend on the facts of each situation." *Bryson*, 96 F.3d at 916. The Seventh Circuit has stated that:

[i]n some cases, for example when an employee is fired, or suffers a reduction in benefits or pay, it is clear that an employee has been the victim of an adverse employment action. But an employment action does not have to be so easily quantified to be considered adverse for our purposes. 'Adverse job action is not limited solely to loss or reduction of pay or monetary benefits. It can encompass other forms of adversity as well.'

*Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir.1996) (quoting *Collins v. State of Illinois*, 830 F.2d 692, 703 (7th Cir.1987)).[4]

King alleges that a tangible aspect of her employment was affected here because after refusing to submit to Bobo's unwelcome sexual advances: (1) her hours were reduced from typically twenty hours per week to ten hours or less; and (2) she suffered worsened work conditions in that (a) Bobo displayed anger towards King (by, for example, throwing shoes she was cleaning on the floor in front of customers) and (b) King was written

---

**3.** Although "a clear and serious *quid pro quo* threat ... can constitute an actionable claim even if the threat remains unfulfilled," *see Jansen*, 123 F.3d at 499 (Flaum, J., concurring), King does not allege that Bobo made any such clear, explicit *quid pro quo* threat.

**4.** On the other hand, "[w]hile adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action." *Smart*, 89 F.3d at 441.

up for attitude problems. (Pl. Resp. at 3.) In response, The Finish Line argues that the reduction of King's hours was not an adverse action because: (1) as admitted by King, part-time sales individual's schedules were flexible; and, (2) regardless of the hours reduction, King intended to go to college in the middle of August anyway.

In short, King has presented undisputed evidence that her hours were reduced after she refused to submit to Bobo's unwelcome sexual advances and she additionally presented evidence of other non-economic detriment. The court thus finds that there is a question of material fact precluding summary judgment regarding whether King was denied a tangible work benefit.

■ To satisfy factor four, King must also, as seen, demonstrate a link between the adverse employment action and King's rejection of Bobo's advances. *See, e.g., Bryson,* 96 F.3d at 917; *Dockter v. Rudolf Wolff Futures, Inc.,* 913 F.2d 456, 462 (7th Cir. 1990). A close temporal nexus, as here, between the victim's refusal to submit to unwelcome sexual conduct and the supervisor's subsequent adverse employment action bolsters such a link. *See, e.g., Savino v. C.P. Hall Co.,* 988 F.Supp. 1171, 1185 (N.D.Ill. 1997).

The Finish Line argues that a link between King's rejection of Bobo's sexual advances and her reduction of work hours cannot be established because its *assistant managers* supervised and evaluated part-time staff.[5] (Def. Reply at 10; Def. 12(m), Ex. 6 ¶ 9.) However, it does not necessarily follow from the fact that assistant managers supervised and evaluated staff that an assistant manager, not Bobo (the lead supervisor at the store), was responsible for demoting King's work hours. And Defendant did not present any evidence that an assistant manager(s)—as opposed to store supervisor Bobo—was responsible for the alleged adverse action here.[6]

On the other hand, King argues that a link may be inferred because the hours reduction occurred "right after" the store manager, Bobo, called her into his office at the end of July, kissed her on the neck and told her to "get with the program;" with King then immediately leaving Bobo's office without response. Hostile behavior from Bobo also paralleled in time the work hours reduction. King additionally argues that The Finish Line's assertion that it decreased King's hours because of her performance is especially suspect because: (a) she was one of the top salespersons at The Finish Line until her hours were reduced (*see* Pl. 12(n) Add. Facts ¶ 12) and (b) when King originally asked two other managers why her hours decreased, they said that they did not know (*see* Pl. 12(n) ¶ 2).

For summary judgment purposes, this court must construe the evidence, and draw reasonable inferences therefrom, in a light most favorable to King. In doing so, the court finds that, as related above, there clearly is sufficient evidence from which a jury could reasonably infer a link between King's rejection of Bobo's sexual advances and the alleged adverse employment action incurred by King at a store at which Bobo was the store manager.

In sum, this court finds that the record here contains evidence from which a jury could reasonably infer that Bobo subjected King to unwelcome sexual conduct and used King's rejection of those advances as the basis for adverse decisions affecting the terms, conditions or privileges of her employ-

---

5. The Finish Line also asserts that its sales associate's hours were flexible due to the number of people and scheduling problems. (Def. Reply at 10.)

6. Attempting to rely on Assistant Manager Dawn Stewart's affidavit, The Finish Line does contend that "the *assistant managers* decided to reduce the plaintiff's hours based on her poor sales performance." (Def. Reply at 10, emphasis added.) But Stewart's affidavit does *not* support this precise contention. Specifically, that affidavit simply does *not* state that an assistant manager reduced King's hours; instead, the affidavit merely states that King's attitude was discussed at management meeting (with the assistant manager *and* Bobo, the store manager) and then states unspecifiedly that "her hours were eventually reduced." (Def.12(n), Ex. 6 ¶ 9.) In addition, although The Finish Lines notes that King received a warning about her attitude on June 26, 1997 (*see* Def. 12(m), Ex. 3), the record does not disclose who issued this warning.

ment. Therefore, summary judgment is denied on Plaintiff's *quid pro quo* claim.

## B. *HOSTILE WORK ENVIRONMENT HARASSMENT*

■ An employee demonstrates a hostile work environment where there was harassment "sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment." *Harris v. Forklift Sys.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). If there was a hostile work environment, the employer is liable if it: (1) knew or should have known of the harassment and (2) was negligent in remedying the harassment. *See, e.g., Perry,* 126 F.3d at 1013; *Zimmerman v. Cook County Sheriff's Dept.,* 96 F.3d 1017, 1018 (7th Cir. 1996).

### 1. *HOSTILE WORK ENVIRONMENT*

■ In determining whether an employee's harassment is "sufficiently severe or pervasive" to constitute hostile work environment, the court may look to several factors, including: (1) the frequency of the discriminatory conduct; (2) the conduct's severity; (3) whether the conduct was physically threatening or humiliating, or a mere offensive utterance; (4) and whether the conduct unreasonably interfered with an employee's work performance. *See, e.g., Saxton v. American Tel. & Telegraph Co.,* 10 F.3d 526, 534 (7th Cir.1993). A court must evaluate the factors from a subjective and objective viewpoint, *i.e.,* the court considers the actual effect of the conduct on the plaintiff along with the likely impact on a reasonable person in the plaintiff's position. *See, e.g., Doe v. R .R. Donnelley & Sons Co.,* 42 F.3d 439, 444 (7th Cir.1994).

While conduct of the type alleged, if found to be true, is certainly disapproved by the court, it is not necessary to reach the question of whether a hostile work environment existed in actuality herein. As explained below, regardless of whether there exists evidence of an actual hostile work environment, the employer (The Finish Line) is not liable because King cannot demonstrate that The Finish Line was negligent.

### 2. *EMPLOYER LIABILITY FOR HOSTILE WORK ENVIRONMENT*

■ Employers are not automatically liable for an environment of sexual harassment created by supervisors or co-workers. Under prevailing Seventh Circuit law, "the standard for employer liability in cases of hostile-environment sexual harassment by a supervisory employee is negligence, not strict liability." *Jansen,* 123 F.3d at 495 (per curiam). An employer who is negligent "in the hiring, supervision, monitoring, or retention" of a plaintiff's supervisor is liable for the hostile work environment created by the supervisor's sexual harassment. *Id.* at 493.

■ For an employer to be liable under a hostile work environment claim, the plaintiff essentially must first show that the employer knew or should have known of the existence of harassment. *Zimmerman,* 96 F.3d at 1019. The victim may put the employer on notice by furnishing sufficient information to make a reasonable employer think that he or she was being harassed. *Id.* This information may also come from persons other than the victim. *See McDonnell v. Cisneros,* 84 F.3d 256, 260 (7th Cir.1996). Finally, when the harassment is particularly pervasive, knowledge on the part of the employer may be inferred. *Meritor,* 477 U.S. at 72.

■ Here, the court finds that King has not demonstrated sufficient facts for a jury to reasonably infer that The Finish Line knew or should have known of the existence of harassment. Defendant's undisputed evidence was that King's assistant manager, Dawn Stewart, was always available to hear complaints. (Def.12(m), Ex. 6 ¶ 2, Ex. 7 ¶ 5.) Moreover, The Finish Line's district manager, Mark Fogo, visited the store weekly and conveyed to each sales person that he was there to help anyone with any problems they were having at the store. (Def.12(m), Ex. 7 ¶ 6.) In the face of this, King admits that she did not ever complain to anybody at Finish Line of any alleged incidents of sexual harassment before she left The Finish Line in August 1994. (Def.12(m) ¶ 5; Pl. 12(n) ¶ 2.) Nor did any other individual complain to

The Finish Line about King's harassment before King left.[7] In addition, in the circumstances here, it cannot be said that the subject harassment was so particularly pervasive as to require an inference of knowledge on the part of The Finish Line.[8]

Accordingly, summary judgment must be granted with respect to King's hostile work environment claim.[9] *See, e.g., Zimmerman,* 96 F.3d at 1018–19; *Perry,* 126 F.3d at 1014.

## *CONCLUSION*

For the foregoing reasons, Defendant The Finish Line, Inc.'s motion for summary judgment is granted as to the hostile work environment claim and denied as to the *quid pro quo* harassment claim.

---

**7.** Plaintiff conclusorily alleges (in one sentence) that Defendant had notice of the harassment because after King had left The Finish Line, King's sister spoke to District Manager Fogo about one of the incidents between King and Bobo. (Pl.12(n) ¶ 2.) Such after the fact mention is insufficient to establish the requisite notice to the employer Defendant. As the Seventh Circuit has expressed, in this type of situation, the employer "cannot be held liable under a negligence standard, for it had no knowledge of [the] alleged harassment until after [plaintiff's] termination." *Gleason v. Mesirow Fin., Inc.,* 118 F.3d 1134, 1146 n. 11 (7th Cir.1997). *See also King v. MCI Telecommunications Corp.,* No. 94, C 421, 1997 WL 124254, at *7 n. 2 (N.D.Ill. March 17, 1997).

**8.** King's sole argument as to pervasiveness is that at a store meeting with underlings Bobo talked about store employees having relationships with each other and announced that the store was his "kingdome [sic]." (Pl. Resp. at 7; Pl. 12(n) ¶ 8.) However, it is not necessary to reach this perhaps tenuous argument as, in any event, King has not submitted any evidence (or even alleged) that anyone in The Finish Line's management hierarchy above Bobo was present at this meeting or otherwise knew about Bobo's statements.

**9.** A plurality of the Seventh Circuit in *Jansen* expressed that when harassment comes at the hands of a supervisor, the employer should be subjected to a "heightened duty of care" to make sure, as is pertinent here, that "the machinery available to employees to complain of harassment" is adequate. *See Jansen,* 123 F.3d at 502–

03 (Flaum, J., concurring (with certain other members of the court joining)); *Perry,* 126 F.3d at 1013 & n. 2.

Here, the court finds that The Finish Line had adequate "machinery available" for King to complain of harassment. King does not dispute that The Finish Line had a sexual harassment policy outlining the steps to be taken to bring conduct to the attention of management. (Def.12(m), Ex. 4.) This policy provided that individuals should report incidents of alleged sexual harassment to their supervisor or "[i]f your Supervisor is engaging in the conduct, or if other circumstances exist which cause you to believe discussion with your Supervisor would be inappropriate, you should report the conduct directly to the next higher management member until you are satisfied that your concerns are being adequately addressed by the Company." (*Id.*)

Relatedly, although King states that she "cannot remember being given an employee handbook or a policy manual" (Pl.12(n) Add. Facts ¶ 2), The Finish Line's undisputed evidence is that The Finish Line's policy was made available to each employee and discussed during monthly meetings. (Def. Mem. at 3; Def. 12(m), Ex. 5 ¶ 6, 7, Ex. 6 ¶ 5, 6, Ex. 7 ¶ 4.) The Finish Line's unrebutted affidavits state that "[t]he sexual harassment policy ... was conveyed to each member of the sales force during their initiation and training meetings," that the policy was "reiterated at monthly meetings by the assistant managers" and that "a copy of the sexual harassment policy was made available at [King's store] location." (Def.12(m), Ex. 5 ¶ 6, 7, Ex. 6 ¶ 5, 6, Ex. 7 ¶ 4.)